# DEMOCRATIC PARTY OF UNITED STATES ET AL. *v.* WISCONSIN EX REL. LA FOLLETTE ET AL.

No. 79–1631.   Argued December 8, 1980—Decided February 25, 1981

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. POWELL, J., filed a dissenting opinion, in which BLACKMUN and REHNQUIST, JJ., joined, *post*, p. 126.

*Ronald D. Eastman* argued the cause for appellants. With him on the briefs was *Lynda S. Mounts.*

*Bronson C. La Follette,* Attorney General, argued the cause for appellee State of Wisconsin. With him on the brief were *Charles Hoornstra, F. Joseph Sensenbrenner, Jr.,* and *Nancy L. Arnold,* Assistant Attorneys General. *Robert H. Friebert* argued the cause for appellee Democratic Party of Wisconsin. With him on the brief was *Carol Skornicka.**

---

*\*Thomas F. Nealon III* filed a brief for The Democratic Conference as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Slade Gorton,* Attorney General of Washington, *Thomas R. Bjorgen,* Assistant Attorney General, *Mike Greely,* Attorney General of Montana, and *Mike McGrath,* Assistant Attorney General, for the State of Washington et al.; and by *David C. Vladeck* and *Alan B. Morrison* for James MacDonald et al.

JUSTICE STEWART delivered the opinion of the Court.

The charter of the appellant Democratic Party of the United States (National Party) provides that delegates to its National Convention shall be chosen through procedures in which only Democrats can participate. Consistently with the charter, the National Party's Delegate Selection Rules provide that only those who are willing to affiliate publicly with the Democratic Party may participate in the process of selecting delegates to the Party's National Convention. The question on this appeal is whether Wisconsin may successfully insist that its delegates to the Convention be seated, even though those delegates are chosen through a process that includes a binding state preference primary election in which voters do not declare their party affiliation. The Wisconsin Supreme Court held that the National Convention is bound by the Wisconsin primary election results, and cannot refuse to seat the delegates chosen in accord with Wisconsin law. 93 Wis. 2d 473, 287 N. W. 2d 519.

I

Rule 2A of the Democratic Selection Rules for the 1980 National Convention states: "Participation in the delegate selection process in primaries or caucuses shall be restricted to Democratic voters only who publicly declare their party preference and have that preference publicly recorded." [1] Under

---

[1] Rule 2A provides in full:

"Participation in the delegate selection process in primaries or caucuses shall be restricted to Democratic voters only who publicly declare their party preference and have that preference publicly recorded. Documentary evidence of a process which complies with this rule shall accompany all state Delegate Selection Plans upon their submission to the National Party. Such rules, when approved by the Compliance Review Commission and implemented shall constitute adequate provisions within the meaning of Section 9 of the 1972 Democratic National Convention mandate."

National Party rules, the "delegate selection process" includes any procedure by which delegates to the Convention are bound to vote for the nomination of particular candidates.[2]

The election laws of Wisconsin[3] allow non-Democrats—

---

[2] Rule 12B of the Delegate Selection Rules for the 1980 Democratic National Convention provides in part:

"At all stages of the delegates selection process, delegates shall be allocated in a fashion that fairly reflects the expressed presidential preference or uncommitted status of the primary voters or if there is no binding primary, the convention and caucus participants except that preferences securing less than the applicable percentage of votes cast for the delegates to the National Convention shall not be awarded any delegates."

Rule 12D provides in full:

"For the purpose of fairly reflecting the division of preferences, the *nonbinding advisory* presidential preference portion of primaries shall *not* be considered a step in the delegate selection process." (Emphasis added.)

[3] Wisconsin's election laws are contained in Wis. Stat., Tit. II, chs. 5–12 (1977). The laws in issue in this case relate to the Presidential preference vote at the spring election, held on the first Tuesday in April in each year in which the Electors for President and Vice President are to be chosen. The relevant provisions are as follows:

"5.37 Voting machine requirements.

. . . . .

"(4) Voting machines may be used at primary elections when they comply with . . . the following provisions: All candidates' names entitled to appear on the ballots at the primary shall appear on the machines; the elector cannot vote for candidates of more than one party, whenever the restriction applies, and an elector who votes for candidates of any party may not vote for independent candidates at the September primary; the elector may secretly select the party for which he or she wishes to vote, or the independent candidates in the case of the September primary; the elector may vote for as many candidates for each office as he or she is lawfully entitled to vote for, but no more.

. . . . .

"5.60 Spring election ballots. At spring elections the following ballots, when necessary, shall be provided for each ward.

. . . . .

"(8) BALLOTS FOR PRESIDENTIAL VOTE. There shall be a separate ballot for each party . . . listing the names of all potential candidates of that party . . . and affording, in addition, an opportunity to the voter to

including members of other parties and independents—to vote in the Democratic primary without regard to party affiliation and without requiring a public declaration of party preference. The voters in Wisconsin's "open" [4] primary express their

nominate another potential candidate by write-in vote or·to vote against the choices offered on the ballot. . . . Each voter shall be given the ballots of all the parties participating in the presidential preference vote, but may vote on one ballot only.

> **.        .        .        ╱ .        .**

"8.12 Presidential preference vote.

> **.        .        .        .        .**

"(3) DELEGATES TO NATIONAL CONVENTION. (a) In canvassing the presidential preference vote, the specific candidate for president receiving a plurality in any district or in the state at large is entitled to control all the delegates representing such area . . . . As an alternative to this procedure, the state chairperson of any political party having a presidential preference ballot may inform the board . . . that the delegates from such party are to be certified on the basis of proportional representation. In such case, each presidential candidate shall be apportioned delegates committed to support him or her as nearly as possible in accordance with the percentage of the vote in a district or in the state at large which such candidate receives. . . .

> **.        .        .        .        .**

[8.12 (3)(b) and 8.12 (3)(c) 5 are described in n. 6, *infra*]

> **.        .        ;        .        .**

"(am) No later than the last Monday in April following the presidential preference vote, the board shall notify each state party organization chairperson . . . of the results of the presidential preference vote cast within his or her party, and the number of delegates from each congressional district and from the state at large which are to be pledged to each presidential candidate and the number which are to be uninstructed."

[4] What characterizes the Wisconsin primary as "open" is that the "voter is not required to declare publicly a party preference or to have that preference publicly recorded." 93 Wis. 2d 473, 485, 287 N. W. 2d 519, 523. See Wis. Stat. §§ 5.60 (8), 10.02 (3) (1977). "The major characteristic of open primaries is that any registered voter can vote in the primary of either party." R. Blank, Political Parties, An Introduction 316 (1980). "The states with open primaries [including Wisconsin] allow any qualified voter to participate in a party primary without designating

choice among Presidential candidates for the Democratic Party's nomination; they do not vote for delegates to the National Convention.   Delegates to the National Convention are chosen separately, after the primary, at caucuses of persons who have stated their affiliation with the Party.[5]   But these delegates, under Wisconsin law, are bound to vote at the National Convention in accord with the results of the open primary election.[6]   Accordingly, while Wisconsin's open Presidential preference primary does not itself violate National Party rules,[7] the State's mandate that the results of the primary shall determine the allocation of votes cast by the State's delegates at the National Convention does.

In May 1979, the Democratic Party of Wisconsin (State Party) submitted to the Compliance Review Commission of the National Party its plan for selecting delegates to the 1980 National Convention.   The plan incorporated the provisions of the State's open primary laws, and, as a result, the Commission disapproved it as violating Rule 2A.[8]   Since compliance with Rule 2A was a condition of participation at

party affiliation or preference."   D. Ippolito & T. Walker, Political Parties, Interest Groups, and Public Policy: Group Influence in American Politics 175 (1980).

[5] The State Party limits participation in the selection of delegates to the National Convention to "persons who are willing to subscribe to the general principles of the Democratic Party and do so publicly by executing an appropriate statement to that effect."   93 Wis. 2d, at 486, 287 N. W. 2d, at 524.

[6] The Convention delegates are bound for a limited period by the outcome of the Presidential preference vote in their respective districts or by the outcome of the total Presidential vote in the State at large.   Wis. Stat. § 8.12 (3) (b) (1977).   Each delegate must pledge to support the candidate to whom the delegate is bound and to vote for that candidate on the first ballot and on any additional ballot, unless the candidate dies or releases the delegate or until the candidate fails to receive at least one-third of the votes authorized to be cast.   Thereafter the delegate's vote at the Convention is based on personal preference.   § 8.12 (3) (c) 5.

[7] Cf. Rule 12D, at n. 2, *supra.*

[8] See n. 1, *supra.*

the Convention, for which no exception could be made,[9] the National Party indicated that Wisconsin delegates who were bound to vote according to the results of the open primary would not be seated.

The State Attorney General then brought an original action in the Wisconsin Supreme Court on behalf of the State. Named as respondents in the suit were the National Party and the Democratic National Committee, who are the appellants in this Court, and the State Party, an appellee here. The State sought a declaration that the Wisconsin delegate selection system was constitutional as applied to the appellants and that the appellants could not lawfully refuse to seat the Wisconsin delegation at the Convention. The State Party responded by agreeing that state law may validly be applied against it and the National Party, and cross-claimed against the National Party, asking the court to order the National Party to recognize the delegates selected in accord with Wisconsin law. The National Party argued that under the First and Fourteenth Amendments it could not be compelled to seat the Wisconsin delegation in violation of Party rules.

The Wisconsin Supreme Court entered a judgment declaring that the State's system of selecting delegates to the Democratic National Convention is constitutional and binding on the appellants. 93 Wis. 2d 473, 287 N. W. 2d 519. The court assumed that the National Party's freedom of political association, protected by the First and Fourteenth Amendments, gave it the right to restrict participation in the process of choosing Presidential and Vice Presidential candidates to Democrats. *Id.*, at 511–512, 287 N. W. 2d, at 536. It concluded, however, that the State had not impermissibly impaired that right. The court said that the State's primary election laws were themselves intended to permit persons to vote only for the candidates of the party they preferred, and

---

[9] Rule 2B precludes any exemption from Rule 2A requirements. See n. 20 and accompanying text, *infra.*

that, as a practical matter, requiring a public declaration of party affiliation would not prevent persons who are not Democrats from voting in the primary.[10]  Moreover, the court reasoned that to whatever extent appellants' constitutional freedom of political association might be burdened by the Wisconsin election laws, the burden was justified by the State's "compelling . . . interest in maintaining the special feature of its primary . . . which permits private declaration of party preference."  *Id.,* at 521, 287 N. W. 2d, at 541.

The court declared that the votes of the state delegation at the National Convention for Presidential and Vice Presidential candidates must be apportioned and cast as prescribed by Wisconsin law, and that the State's delegates could not for that reason be disqualified from being seated at the Convention.[11]  The National Party and the Democratic National Committee then brought this appeal under 28 U. S. C. § 1257 (2).

Wisconsin held its primary on April 1, 1980, in accord with its election laws.  Subsequently, the State Party chose delegates to the 1980 Democratic National Convention, in compliance with the order of the Wisconsin Supreme Court and Wis. Stat. §§ 8.12 (3)(b), (3)(c) 5 (1977).  This Court noted probable jurisdiction of the appeal on July 2, 1980.  448 U. S. 909.  On the same day, the Court stayed the judgment of

---

[10] The court reasoned that because a primary voter must vote on only one party's ballot, he effectively declares his affiliation, albeit privately.

[11] The order of the Wisconsin Supreme Court was as follows:

"It is adjudged and declared that the Wisconsin electoral statutes involved in this controversy are constitutional, in full force and effect and binding on the petitioner and respondents; that the presidential preference primary shall be conducted in accordance with the Wisconsin statutes; and that Wisconsin delegates to the Democratic Party national convention shall be apportioned as required by statute in accordance with the results of the presidential preference vote and are not disqualified as delegates solely by reason of the apportionment being determined as required by the Wisconsin statutes."  93 Wis. 2d, at 525–526, 287 N. W. 2d, at 543.

the Wisconsin Supreme Court. On July 20, 1980, the Credentials Committee of the National Convention decided to seat the delegates from Wisconsin, despite this Court's stay,[12] and despite the delegates' selection in a manner that violated Rule 2A.[13]

## II

Rule 2A can be traced to efforts of the National Party to study and reform its nominating procedures and internal structure after the 1968 Democratic National Convention.[14]

---

[12] In oral argument, counsel for the National Party asserted that the Party did not have the time or resources, at that late date, to establish a procedure to select an alternative slate of delegates.

[13] This case is not moot. The Wisconsin Supreme Court's order is not explicitly limited to the 1980 Convention. The effect of the order "remains and controls future elections." *Moore* v. *Ogilvie*, 394 U. S. 814, 816. In any event, even if the order were clearly limited to the 1980 election year, the controversy would be properly before us as one "capable of repetition, yet evading review." *Rosario* v. *Rockefeller*, 410 U. S. 752, 756, n. 5; *Dunn* v. *Blumstein*, 405 U. S. 330, 333, n. 2.

[14] Wisconsin's open primary system has a history far longer than that of Rule 2A of the National Party. The open primary was adopted in 1903, and in the words of the Wisconsin Supreme Court, it has "functioned well" ever since. 93 Wis. 2d, at 514, 287 N. W. 2d, at 537. The open primary is employed in Wisconsin not only to express preference for Presidential candidates, but to choose "partisan . . . state and local candidates . . . and an extensive array of nonpartisan officers" as well. *Ibid.* For a history of Wisconsin's open primary, see Part II of the Wisconsin Supreme Court opinion. *Id.*, at 491–495, 287 N. W. 2d, at 526–528. See also Berdahl, Party Membership in the United States, 36 Am. Pol. Sci. Rev. 16, 39–41 (1942).

Wisconsin's open primary apparently is still very popular. On September 5, 1979, by a unanimous vote of its Senate and a 92–1 vote of its Assembly, the Wisconsin Legislature reaffirmed by joint resolution the "firm and enduring commitment of the people of Wisconsin to the open presidential preference primary law as an integral element of Wisconsin's proud tradition of direct and effective participatory democracy." And on September 14, 1979, a bill to create a modified closed primary was defeated in committee. 93 Wis. 2d, at 490, n. 14, 287 N. W. 2d, at 526, n. 14.

The Convention, the Party's highest governing authority, directed the Democratic National Committee (DNC) to establish a Commission on Party Structure and Delegate Selection (McGovern/Fraser Commission). This Commission concluded that a major problem faced by the Party was that rank-and-file Party members had been underrepresented at its Convention, and that the Party should "find methods which would guarantee every American *who claims a stake in the Democratic Party* the opportunity to make his judgment felt in the presidential nominating process." Commission on Party Structure and Delegate Selection, Mandate for Reform: A Report of the Commission on Party Structure and Delegate Selection to the Democratic National Committee 8 (Apr. 1970) (emphasis added) (hereafter Mandate for Reform). The Commission stressed that Party nominating procedures should be as open and accessible as possible to all persons who wished to join the Party,[15] but expressed the concern that "a full opportunity for all Democrats to participate is diluted if members of other political parties are allowed to participate

---

[15] The McGovern/Fraser Commission adopted guidelines to eliminate state party practices that limited the access of rank-and-file Democrats to the candidate selection procedures, as well as those that tended to dilute the influence of each Democrat who took advantage of expanded opportunities to participate. Mandate for Reform, at 12. For example, the guidelines required that the delegates ultimately chosen, and their apportionment to particular candidates, had to reflect the candidate preferences of Democrats participating at all levels of the selection process. *Id.*, at 44. Among other measures recommended by the Commission were (1) the abolition of the unit rule at any stage of the delegate selection process so that majorities could not bind dissenting minorities to vote in accordance with majority wishes; (2) adequate public notice of times and places of meetings related to the delegate selection process; (3) the requirement that ballots indicate the Presidential preference of candidates, or of slates of delegates; and (4) the prohibition of discrimination against racial minorities, women, and young people. *Id.*, at 44–46. See also Segal, Delegate Selection Standards: The Democratic Party's Experience, 38 Geo. Wash. L. Rev. 873, 880–881 (1970).

in the selection of delegates to the Democratic National Convention." *Id.*, at 47.[16]

The 1972 Democratic National Convention also established a Commission on Delegate Selection and Party Structure (Mikulski Commission). This Commission reiterated many of the principles announced by the McGovern/Fraser Commission, but went further to propose binding rules directing state parties to restrict participation in the delegate selection process to Democratic voters. Commission on Delegate Selection and Party Structure, Democrats All: A Report of the Commission on Delegate Selection and Party Structure 2, 15 (Dec. 6, 1973) (hereafter Democrats All). The DNC incorporated these recommendations into the Delegate Selection Rules for the 1976 Convention. In 1974, the National Party adopted its charter and by-laws. The charter set the following qualifications for delegates to the Party's national conventions:

> "The National Convention shall be composed of delegates who are chosen through processes which (i) assure all Democratic voters full, timely and equal opportunity to participate and include affirmative action programs toward that end, (ii) assure that delegations fairly reflect the division of preferences expressed by those who participate in the presidential nominating process, . . . [and] (v) *restrict participation to Democrats only . . . .*" Democratic National Committee, Charter of the Democratic Party of the United States, Art. Two, § 4 (emphasis added).

---

[16] The recommendations of the McGovern/Fraser Commission were subsequently incorporated into the Call to the 1972 Convention, which set forth the formal requirements of the delegate selection and nominating processes for the Convention. They were also favorably received by at least one group monitoring their implementation at the 1972 Democratic National Convention. See Americans for Democratic Action, "Let Us Continue . . .", A Report on the Democratic Party's Delegate Selection Guidelines (1973).

Rule 2A took its present form in 1976. Consistent with the charter, it restricted participation in the delegate selection process in primaries or caucuses to "Democratic voters only who publicly declare their party preference and have that preference publicly recorded." But the 1976 Delegate Selection Rules allowed for an exemption from any rule, including Rule 2A, that was inconsistent with state law if the state party was unable to secure changes in the law.[17]

In 1975, the Party established yet another commission to review its nominating procedures, the Commission on Presidential Nomination and Party Structure (Winograd Commission). This Commission was particularly concerned with what it believed to be the dilution of the voting strength of Party members in States sponsoring open or "crossover" primaries.[18] Indeed, the Commission based its concern in part on a study of voting behavior in Wisconsin's open primary. See Adamany, Cross-Over Voting and the Democratic Party's Reform Rules, 70 Am. Pol. Sci. Rev. 536, 538–539 (1976).

The Adamany study, assessing the Wisconsin Democratic primaries from 1964 to 1972, found that crossover voters comprised 26% to 34% of the primary voters; that the voting patterns of crossover voters differed significantly from those of participants who identified themselves as Democrats; and that crossover voters altered the composition of the delegate slate chosen from Wisconsin.[19] The Winograd Commission

---

[17] Under Rule 20 state parties must take "provable positive steps to achieve legislative changes to bring the state law into compliance with the provisions of these rules." If a state party takes such provable positive steps but is unable to obtain the necessary legislative changes, the state party may be eligible for a Rule 20 exemption. In 1976, the Wisconsin State Party obtained such an exemption from the 1976 version of Rule 2A.

[18] A crossover primary is one that permits nonadherents of a party to "cross over" and vote in that party's primary.

[19] In 1964, crossovers made up 26% of the participants in the Wisconsin Democratic primary. Seven percent of those identifying themselves

thus recommended that the Party strengthen its rules against crossover voting, Openness, Participation and Party Building: Reforms for a Stronger Democratic Party 68 (Feb. 17, 1978) (hereafter Openness, Participation), predicting that continued crossover voting "could result in a convention delegation which did not fairly reflect the division of preferences among Democratic identifiers in the electorate." *Ibid.* And it specifically recommended that "participation in the delegate selection process in primaries or caucuses . . . be restricted to Democratic voters only who publicly declare their party preference and have that preference publicly recorded." *Id.,* at 69. Accordingly, the text of Rule 2A was retained, but a new Rule, 2B, was added, prohibiting any exemptions from

---

as Democrats voted for Governor George Wallace, but 62% of the crossovers voted for him. Three-quarters of Governor Wallace's support in the Democratic primary came from crossover voters. Adamany, Cross-Over Voting and the Democratic Party's Reform Rules, 70 Am. Pol. Sci. Rev. 536, 541 (1976).

In 1968, crossovers constituted 28% of the participants in the Wisconsin Democratic primary. Forty-eight percent of those who said they were Democrats voted for Senator Eugene McCarthy, while 39% voted for President Johnson. Of the crossovers, however, 70% voted for Senator McCarthy, while only 14% voted for President Johnson. Participation of crossovers increased Senator McCarthy's margin of victory over President Johnson in Wisconsin by 2½ times. *Id.,* at 539.

In 1972, crossovers amounted to 34% of the participants. Fifty-one percent of the self-identified Democrats voted for Senator George McGovern, while only 7% voted for Governor Wallace. Of the crossovers, however, only 33% voted for Senator McGovern, while 29% voted for Governor Wallace. The study figures indicate that two-thirds of Governor Wallace's support in the Democratic primary came from crossover voters. *Ibid.* The study found that "the participation of crossover voters will . . . alter the composition of national convention delegations." *Id.,* at 540.

These data, of course, are relevant only insofar as they help to explain the derivation of Rule 2A. The application of Rule 2A to the delegate selection procedures of any State is not in any way dependent on the pattern or history of voting behavior in that State.

Rule 2A. Delegate Selection Rules for the 1980 Democratic Convention, Rule 2B.[20]

### III

The question in this case is not whether Wisconsin may conduct an open primary election if it chooses to do so, or whether the National Party may require Wisconsin to limit its primary election to publicly declared Democrats.[21] Rather, the question is whether, once Wisconsin has opened its Democratic Presidential preference primary to voters who do not publicly declare their party affiliation, it may then bind the National Party to honor the binding primary results, even though those results were reached in a manner contrary to National Party rules.

The Wisconsin Supreme Court considered the question before it to be the constitutionality of the "open" feature of the state primary election law, as such. Concluding that the

---

[20] Rule 2A was the only rule applicable to the 1980 Convention that permitted no exemption. Rule 2B reads in full: "A Rule 20 exemption [see n. 17, *supra*] shall not be granted from Rule 2A requirements."

[21] In its answer to the complaint filed by the Wisconsin Attorney General, the National Party stated that it would "recognize only those delegate votes at the 1980 Convention which are the product of delegate selection processes, whether in binding primaries, conventions, or caucuses, which are restricted to Democratic voters who publicly declare their party preference and have that preference publicly recorded." The National Party nowhere indicated that the Wisconsin primary cannot be open; it averred only that any process adopted by the State that *binds* the National Party must comply with Party rules. And in the joint stipulation of facts before the Wisconsin Supreme Court, the National Party did not declare that Wisconsin must abandon its open primary. The National Party said only that if Wisconsin does not change its primary laws by requiring public party declaration consistent with Party rules, it would be satisfied with some other, Party-run, delegate selection system that did comply with Party rules. This statement is consistent with Rule 2C of the 1980 Delegate Selection Rules, which provides that "[a] State Party which is precluded by state statute from complying with this rule [2A], shall adopt and implement an alternative Party-run delegate selection system which complies with this rule." Cf. Rule 20, at n. 17, *supra*.

open primary serves compelling state interests by encouraging voter participation, the court held the state open primary constitutionally valid. Upon this issue, the Wisconsin Supreme Court may well be correct. In any event, there is no need to question its conclusion here. For the rules of the National Party do not challenge the authority of a State to conduct an open primary, so long as it is not binding on the National Party Convention. The issue is whether the State may compel the National Party to seat a delegation chosen in a way that violates the rules of the Party. And this issue was resolved, we believe, in *Cousins* v. *Wigoda*, 419 U. S. 477.

In *Cousins* the Court reviewed the decision of an Illinois court holding that state law exclusively governed the seating of a state delegation at the 1972 Democratic National Convention, and enjoining the National Party from refusing to seat delegates selected in a manner in accord with state law although contrary to National Party rules. Certiorari was granted "to decide the important question . . . whether the [a]ppellate [c]ourt was correct in according primacy to state law over the National Political Party's rules in the determination of the qualifications and eligibility of delegates to the Party's National Convention." *Id.*, at 483. The Court reversed the state judgment, holding that "Illinois' interest in protecting the integrity of its electoral process cannot be deemed compelling in the context of the selection of delegates to the National Party Convention." *Id.*, at 491. That disposition controls here.

The *Cousins* Court relied upon the principle that "[t]he National Democratic Party and its adherents enjoy a constitutionally protected right of political association." *Id.*, at 487. See also, *id.*, at 491 (REHNQUIST, J., concurring). This First Amendment freedom to gather in association for the purpose of advancing shared beliefs is protected by the Fourteenth Amendment from infringement by any State. *Kusper* v. *Pontikes*, 414 U. S. 51, 57; *Williams* v. *Rhodes*, 383 U. S. 23, 30–31. See also *NAACP* v. *Alabama ex rel. Patterson*,

357 U. S. 449, 460. And the freedom to associate for the "common advancement of political beliefs," *Kusper* v. *Pontikes, supra,* at 56, necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only.[22] "Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250; see *NAACP* v. *Button,* 371 U. S. 415, 431.

Here, the members of the National Party, speaking through their rules, chose to define their associational rights by limiting those who could participate in the processes leading to the selection of delegates to their National Convention. On several occasions this Court has recognized that the inclusion of persons unaffiliated with a political party may seriously distort its collective decisions—thus impairing the party's essential functions—and that political parties may accordingly protect themselves "from intrusion by those with adverse political principles." *Ray* v. *Blair,* 343 U. S. 214, 221–222. In *Rosario* v. *Rockefeller,* 410 U. S. 752, for example, the Court sustained the constitutionality of a requirement—there imposed by a state statute—that a voter enroll in the party of his choice at least 30 days before the general election in order to vote in the next party primary. The purpose of that statute was "to inhibit party 'raiding,' whereby voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the other party's primary." *Id.,* at 760.[23] See also *Kusper* v. *Pontikes, supra,* at 59–60.

---

[22] "Freedom of association would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being." L. Tribe, American Constitutional Law 791 (1978).

[23] The extent to which "raiding" is a motivation of Wisconsin voters matters not. As the Winograd Commission acknowledged, "the existence

The Wisconsin Supreme Court recognized these constitutional doctrines in stating that the National Party could exclude persons who are not Democrats from the procedures through which the Party's national candidates are actually chosen. 93 Wis. 2d, at 499, 287 N. W. 2d, at 530. But the court distinguished *Cousins* on the ground that this case "does not arise 'in the context of the selection of delegations to the National Party Convention. . . .' " [24]  *Id.,* at 525, 287 N. W. 2d, at 543. The court's order, however, unequivocally obligated the National Party to accept the delegation to the National Convention chosen in accord with Wisconsin law, despite contrary National Party rules.

The State argues that its law places only a minor burden on the National Party. The National Party argues that the burden is substantial, because it prevents the Party from "screen[ing] out those whose affiliation is . . . slight, tenuous, or fleeting," and that such screening is essential to build a more effective and responsible Party. But it is not for the courts to mediate the merits of this dispute. For even if the State were correct,[25] a State, or a court, may not con-

---

of 'raiding' has never been conclusively proven by survey research." Openness, Participation, at 68. The concern of the National Party is, rather, with crossover voters in general, regardless of their motivation.

[24] The appellees similarly argue that *Cousins* is inapposite. They contend that the decision in *Cousins* involved the direct election of individual delegates to the National Convention, while this case does not. But appellees, like the Wisconsin Supreme Court, fail to recognize that the problem presented by this case is not the "openness" of Wisconsin's primary in and of itself, but the binding effect of Wisconsin law on the freedom of the National Party to define its own eligibility standards.

[25] It may be the case, of course, that the public avowal of party affiliation required by Rule 2A provides no more assurance of party loyalty than does Wisconsin's requirement that a person vote in no more than one party's primary. But the stringency, and wisdom, of membership requirements is for the association and its members to decide—not the courts—so long as those requirements are otherwise constitutionally permissible.

stitutionally substitute its own judgment for that of the Party. A political party's choice among the various ways of determining the makeup of a State's delegation to the party's national convention is protected by the Constitution.[26] And as is true of all expressions of First Amendment freedoms, the courts may not interfere on the ground that they view a particular expression as unwise or irrational.[27]

## IV

We must consider, finally, whether the State has compelling interests that justify the imposition of its will upon the appellants. See *Cousins,* 419 U. S., at 489.[28] "Neither the right to associate nor the right to participate in political activities is absolute." *CSC* v. *Letter Carriers,* 413 U. S. 548, 567. The State asserts a compelling interest in preserving the overall integrity of the electoral process, providing secrecy

---

[26] Cf. *Ripon Society, Inc.* v. *National Republican Party,* 173 U. S. App. D. C. 350, 368, 525 F. 2d 567, 585 (en banc) ("[A] party's choice, as among various ways of governing itself, of the one which seems best calculated to strengthen the party and advance its interests, deserves the *protection* of the Constitution . . .") (emphasis of the court), cert. denied, 424 U. S. 933.

[27] The State Party argues at length that empirical data do not support the National Party's need for Rule 2A. That argument should be addressed to the National Party—which has studied the need for something like Rule 2A for 12 years, see Part II, *supra*—and not to the judiciary.

The State also contends that the National Party should not be able to prevent "principled crossovers" from influencing the selection of its candidate, and that the appellants have not presented any evidence that "raiding" has been a problem. These contentions are irrelevant. See n. 23, *supra*. It is for the National Party—and not the Wisconsin Legislature or any court—to determine the appropriate standards for participation in the Party's candidate selection process.

[28] Obviously, States have important interests in regulating primary elections, *United States* v. *Classic,* 313 U. S. 299. A State, for example, "has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies." *Bullock* v. *Carter,* 405 U. S. 134, 145.

of the ballot, increasing voter participation in primaries, and preventing harassment of voters.[29] But all those interests go to the conduct of the Presidential preference primary—not to the imposition of voting requirements upon those who, in a separate process, are eventually selected as delegates.[30] Therefore, the interests advanced by the State [31] do not justify

---

[29] The Wisconsin Supreme Court identified the interests of the State as follows:

"The state's interest in maintaining a primary and in not restricting voting in the presidential preference primary to those who publicly declare and record their party preference is to preserve the overall integrity of the electoral process by encouraging increased voter participation in the political process and by providing secrecy of the ballot, thereby ensuring that the primary itself and the political party's participation in the primary are conducted in a fair and orderly manner." 93 Wis. 2d, at 512, 287 N. W. 2d, at 536.

[30] The State contends repeatedly that the issue whether it can prevent the National Party from determining the qualifications of National Convention delegates is not presented. But this contention utterly ignores the Wisconsin Supreme Court order, and Wis. Stat. §§ 8.12 (3) (b), 3 (c) 5 (1977). The State Party acknowledges near the end of its brief that "[p]erhaps the real issue in this case is not whether Wisconsin can conduct an open primary, but rather whether it can make the results of the open primary binding upon Wisconsin delegates to the National Convention."

[31] The State attempts to add constitutional weight to its claims with the authority conferred on the States by Art. II, § 1, cl. 2, of the United States Constitution: "Each state shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which a State may be entitled." See *In re Green*, 134 U. S. 377, 379; *McPherson* v. *Blacker*, 146 U. S. 1, 27–28; *Ray* v. *Blair*, 343 U. S. 214; *Oregon* v. *Mitchell*, 400 U. S. 112, 291 (opinion of STEWART, J., joined by BURGER, C. J., and BLACKMUN, J.); see also *Cousins* v. *Wigoda*, 419 U. S. 477, 495–496 (REHNQUIST, J., concurring in result). Any connection between the process of selecting electors and the means by which political party members in a State associate to elect delegates to party nominating conventions is so remote and tenuous as to be wholly without constitutional significance. In *Cousins*, despite similar arguments by Illinois, all nine Justices agreed that a State could not constitutionally compel a national political convention to seat

its substantial [32] intrusion into the associational freedom of members of the National Party.

## V

The State has a substantial interest in the manner in which its elections are conducted, and the National Party has a substantial interest in the manner in which the delegates to its National Convention are selected. But these interests are not incompatible, and to the limited extent they clash in this case, both interests can be preserved. The National Party rules do not forbid Wisconsin to conduct an open primary. But if Wisconsin does open its primary, it cannot require that Wisconsin delegates to the National Party Convention vote there in accordance with the primary results, if to do so would violate Party rules. Since the Wisconsin Supreme Court has declared that the National Party cannot disqualify delegates who are bound to vote in accordance with the results of the Wisconsin open primary, its judgment is reversed.

*It is so ordered.*

JUSTICE POWELL, with whom JUSTICE BLACKMUN and JUSTICE REHNQUIST join, dissenting.

Under Wisconsin law, the Wisconsin delegations to the Presidential nominating conventions of the two major political parties are required to cast their votes in a way that

---

delegates against its will. See *id.*, at 488; *id.*, at 492 (REHNQUIST, J., concurring in result); *id.*, at 496 (POWELL, J., concurring in part and dissenting in part).

[32] Because the actual selection of delegates is within the control of persons who publicly proclaim their allegiance to the Democratic Party, the Wisconsin Supreme Court apparently deduced that the effects of the open primary on the nominating process were minimal. But the court ignored the fact—the critical fact in the case—that under Wisconsin law state delegates are bound to cast their votes at the National Convention in accord with the open primary outcomes.

reflects the outcome of the State's "open" primary election. That election is conducted without advance party registration or any public declaration of party affiliation, thus allowing any registered voter to participate in the process by which the Presidential preferences of the Wisconsin delegation to the Democratic National Convention are determined. The question in this case is whether, in light of the National Party's rule that only publicly declared Democrats may have a voice in the nomination process, Wisconsin's open primary law infringes the National Party's First Amendment rights of association. Because I believe that this law does not impose a substantial burden on the associational freedom of the National Party, and actually promotes the free political activity of the citizens of Wisconsin, I dissent.

## I

The Wisconsin open primary law was enacted in 1903. 1903 Wis. Laws, ch. 451. It was amended two years later to apply to Presidential nominations. 1905 Wis. Laws, ch. 369. See 93 Wis. 2d 473, 492, 287 N. W. 2d 519, 527 (1980). As the Wisconsin Supreme Court described in its opinion below:

> "The primary was aimed at stimulating popular participation in politics thereby ending boss rule, corruption, and fraudulent practices which were perceived to be part of the party caucus or convention system. Robert M. La Follette, Sr., supported the primary because he believed that citizens should nominate the party candidates; that the citizens, not the party bosses, could control the party by controlling the candidate selection process; and that the candidates and public officials would be more directly responsible to the citizens." *Ibid.*

As noted in the opinion of the Court, the open primary law only recently has come into conflict with the rules of the National Democratic Party. The new Rule 2A was enacted

as part of a reform effort aimed at opening up the party to greater popular participation. This particular rule, however, has the ironic effect of calling into question a state law that was intended itself to open up participation in the nominating process and minimize the influence of "party bosses."

## II

The analysis in this kind of First Amendment case has two stages. If the law can be said to impose a burden on the freedom of association, then the question becomes whether this burden is justified by a compelling state interest. *E. g.,* *Bates* v. *Little Rock,* 361 U. S. 516, 524 (1960). The Court in this case concludes that the Wisconsin law burdens associational freedoms. It then appears to acknowledge that the interests asserted by Wisconsin are substantial, *ante,* at 120–121, but argues that these interests "go to the conduct of the Presidential preference primary—not to the imposition of voting requirements upon those who, in a separate process, are eventually selected as delegates," *ante,* at 125. In my view, however, any burden here is not constitutionally significant, and the State has presented at least a formidable argument linking the law to compelling state interests.

## A

In analyzing the burden imposed on associational freedoms in this case, the Court treats the Wisconsin law as the equivalent of one regulating delegate selection, and, relying on *Cousins* v. *Wigoda,* 419 U. S. 477 (1975), concludes that any interference with the National Party's accepted delegate-selection procedures impinges on constitutionally protected rights. It is important to recognize, however, that the facts of this case present issues that differ considerably from those we dealt with in *Cousins.*

In *Cousins,* we reversed a determination that a state court could interfere with the Democratic Convention's freedom to

select one delegation from the State of Illinois over another. At issue in the case was the power of the National Party to reject a delegation chosen in accordance with state law because the State's delegate-selection procedures violated party rules regarding participation of minorities, women, and young people, as well as other matters. See *id.*, at 479, n. 1. The state court had ordered the Convention to seat the delegation chosen under state law, rather than the delegation preferred by the Convention itself. In contrast with the direct state regulation of the delegate-selection process at issue in *Cousins*, this case involves a state statutory scheme that regulates delegate *selection* only indirectly. Under Wisconsin law, the "method of selecting the delegates or alternates [is] determined by the state party organization," Wis. Stat. § 8.12 (3)(b) (1977). Wisconsin simply mandates that each delegate selected, by whatever procedure, must be pledged to represent a candidate who has won in the state primary election the right to delegate votes at the Convention.[1]

In sum, Wisconsin merely requires that the delegates "vote in accordance with the results of the Wisconsin open primary." *Ante*, at 126. While this regulation affecting participation in the primary is hardly insignificant, it differs substantially from the direct state interference in delegate selection at issue in *Cousins*. This difference serves to emphasize the importance of close attention to the way in which a state law is said to impose a burden on a party's freedom of association. Cf. *Marchioro* v. *Chaney*, 442 U. S. 191, 199 (1979). All that Wisconsin has done is to require the major parties to allow voters to affiliate with them—for the limited purpose of participation in a primary—*secretly*, in the pri-

---

[1] The delegates selected must be approved by the candidate they are to represent, Wis. Stat. § 8.12 (3)(b) (1977), and must pledge that they are affiliated with the candidate's party and will support their candidate until he or she fails to receive at least one-third of the votes authorized to be cast at the Convention, § 8.12 (3)(c).

vacy of the voting booth.[2]  The Democrats remain free to require public affiliation from anyone wishing any greater degree of participation in party affairs.  In Wisconsin, participation in the caucuses where delegates are selected is limited to publicly affiliated Democrats.  Brief for Appellee Democratic Party of Wisconsin 19.  And, as noted above, the State's law *requires* that delegates themselves affirm their membership in the party publicly.

In evaluating the constitutional significance of this relatively minimal state regulation of party membership requirements, I am unwilling—at least in the context of a claim by one of the two major political parties—to conclude that every conflict between state law and party rules concerning participation in the nomination process creates a burden on associational rights.  Instead, I would look closely at the nature

---

[2] It is not fully accurate to say, as the Court does, that the "election laws of Wisconsin allow non-Democrats—including members of other parties and independents—to vote in the Democratic primary." *Ante,* at 110–111.  The Wisconsin statute states that "[i]n each year in which electors for president and vice president are to be elected, the voters of this state shall at the spring election be given an opportunity to express their preference for the person to be the presidential candidate *of their party."* Wis. Stat. § 8.12 (1) (1977) (emphasis added).  Thus, the act of voting in the Democratic primary fairly can be described as an act of affiliation with the Democratic Party.  The real issue in this case is whether the Party has the right to decide that only *publicly* affiliated voters may participate.

The situation might be different in those States with "blanket" primaries—*i. e.,* those where voters are allowed to participate in the primaries of more than one party on a single occasion, selecting the primary they wish to vote in with respect to each individual elective office. *E. g.,* Wash. Rev. Code § 29.18.200 (1976).  Cf. 93 Wis. 2d 473, 504, 287 N. W. 2d 519, 532 (1980) ("[T]he legislature has taken steps to encourage voters to participate in the primary of their party and to discourage a voter of one party from being tempted to vote in the primary of another party.  Limiting voters to only one party's ballot discourages voters from voting on a ballot of a party other than their own, because in order to do so they would have to sacrifice their opportunity to participate in their own party's selection process").

of the intrusion, in light of the nature of the association involved, to see whether we are presented with a real limitation on First Amendment freedoms.

It goes without saying that nomination of a candidate for President is a principal function performed by a national political party, and Wisconsin has, to an extent, regulated the terms on which a citizen may become a "member" of the group of people permitted to influence that decision. If appellant National Party were an organization with a particullar ideological orientation or political mission, perhaps this regulation would present a different question.[3] In such a case, the state law might well open the organization to participation by persons with incompatible beliefs and interfere with the associational rights of its founders.

The Democratic Party, however, is not organized around the achievement of defined ideological goals. Instead, the major parties in this country "have been characterized by a fluidity and overlap of philosophy and membership." *Rosario* v. *Rockefeller,* 410 U. S. 752, 769 (1973) (POWELL, J., dissenting). It can hardly be denied that this Party generally has been composed of various elements reflecting most of the American political spectrum.[4] The Party does take positions

---

[3] Compare *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 462–463 (1958), where the Court was careful to assess the effect of a membership disclosure requirement on associational freedoms in light of the particular nature of the organization involved and the likely responses of those opposed to its aims.

[4] See R. Horn, Groups and the Constitution 103–104 (1956); A. Campbell, P. Converse, W. Miller, & D. Stokes, The American Voter 183–187, 543 (1960); Developments in the Law: Elections, 88 Harv. L. Rev. 1111, 1166 (1975). The Charter of the National Democratic Party states that it is "open to all who desire to support the party and . . . be known as Democrats." Art. Ten, § 1.

This perception need not be taken as a criticism of the American party structure. The major parties have played a key role in forming coalitions and creating consensus on national issues. "Broad-based political parties supply an essential coherence and flexibility to the American political

132

on public issues, but these positions vary from time to time, and there never has been a serious effort to establish for the Party a monolithic ideological identity by excluding all those with differing views. As a result, it is hard to see what the Democratic Party has to fear from an open primary plan. Wisconsin's law may influence to some extent the outcome of a primary contest by allowing participation by voters who are unwilling to affiliate with the Party publicly. It is unlikely, however, that this influence will produce a delegation with preferences that differ from those represented by a substantial number of delegates from other parts of the country. Moreover, it seems reasonable to conclude that, insofar as the major parties do have ideological identities, an open primary merely allows relatively independent voters to cast their lot with the party that speaks to their present concerns.[5]

---

scene. They serve as coalitions of different interests that combine to seek national goals." *Branti* v. *Finkel,* 445 U. S. 507, 532 (1980) (POWELL, J., dissenting). As Professor Ranney has written:

"[E]ach party has sought winning coalitions by attempting. accommodations among competing interests it hopes will appeal to more contributors and voters than will the rival accommodations offered by the opposition party. This strategy, it is conceded, has resulted in vague, ambiguous, and overlapping party programs and in elections that offer the voters choices between personalities and, at most, general programmatic tendencies, certainly not unequivocal choices between sharply different programs. But this . . . is not a vice but a virtue, for it has enabled Americans through all but one era of their history to manage their differences with relatively little violence and to preserve the world's oldest constitutional democratic regime." A. Ranney, Curing the Mischiefs of Faction 201 (1975).

[5] See Comment, The Constitutionality of Non-Member Voting in Political Party Primary Elections, 14 Willamette L. J. 259, 290 (1978) ("Independents and members of other parties who seek to participate in a party primary will do so precisely because they identify with the community of interest, if indeed one exists. Their very motive for participating in the primary would be to associate with a party presenting 'candidates and issues more responsive to their immediate concerns' "), quoting *Rosario* v. *Rockefeller,* 410 U. S. 752, 769 (1973) (POWELL, J., dissenting).

By attracting participation by relatively independent-minded voters, the Wisconsin plan arguably may enlarge the support for a party at the general election.

It is significant that the Democratic Party of Wisconsin, which represents those citizens of Wisconsin willing to take part publicly in Party affairs, is here *defending* the state law. Moreover, the National Party's apparent concern that the outcome of the Wisconsin Presidential primary will be skewed cannot be taken seriously when one considers the alternative delegate-selection methods that are acceptable to the Party under its rules. Delegates pledged to various candidates may be selected by a caucus procedure involving a small minority of Party members, as long as all participants in the process are publicly affiliated. While such a process would eliminate "crossovers," it would be at least as likely as an open primary to reflect inaccurately the views of a State's Democrats.[6] In addition, the National Party apparently is quite willing to accept public affiliation immediately before primary voting, which some States permit.[7] As Party affiliation becomes this easy for a voter to change in order to participate in a particular primary election, the difference between open and closed primaries loses its practical significance.[8]

---

[6] The unrepresentative nature of the delegate selections produced by caucuses is suggested by differences between the results of caucuses and nonbinding primaries held in the same State. See n. 11, *infra*.

[7] *E. g.*, Tenn. Code Ann. § 2–7–115 (b)(2) (1979). See Developments in the Law, *supra* n. 4, at 1164.

[8] As one scholar has stated:

"The distinctions between open and closed primaries are easy to exaggerate. Too simple a distinction ignores the range of nuances and varieties within the closed primary states, which after all do account for 82 percent of the states. Take the case of Illinois. Voters do not register as members of a party; at the polling place they simply state their party preference and are given the ballot of that party, no questions asked. Because Illinois voters must disclose a party preference before entering the voting booth, their primary is generally considered 'closed.' One would be hard put, however, to argue that it is in operation much different from an open

134

In sum, I would hold that the National Party has failed to make a sufficient showing of a burden on its associational rights.[9]

## B

The Court does not dispute that the State serves important interests by its open primary plan. Instead the Court argues that these interests are irrelevant because they do not support a requirement that the outcome of the primary be binding on delegates chosen for the convention. This argument, however, is premised on the unstated assumption that a nonbinding primary would be an adequate mechanism for pursuing the state interests involved. This assumption is unsupportable because the very purpose of a Presidential primary, as enunciated as early as 1903 when Wisconsin passed its first primary law, was to give control over the nomination process to individual voters.[10] Wisconsin cannot do this, and still pursue the interests underlying an open primary, without making the open primary binding.[11]

---

primary." F. Sorauf, Party Politics in America 206 (4th ed. 1980) (hereinafter Sorauf).

[9] Of course, the National Party could decide that it no longer wishes to be a relatively nonideological party, but it has not done so. Such a change might call into question the institutionalized status achieved by the two major parties in state and federal law. It cannot be denied that these parties play a central role in the electoral process in this country, to a degree that has led this Court on occasion to impose constitutional limitations on party activities. See *Smith* v. *Allwright,* 321 U. S. 649 (1944); *Terry* v. *Adams,* 345 U. S. 461 (1953). Arguably, the special status of the major parties is an additional factor favoring state regulation of the electoral process even in the face of a claim by such a party that this regulation has interfered with its First Amendment rights.

[10] See, *e. g.,* Sorauf 204 ("it was an article of faith among [the Progressives] that to cure the ills of democracy one needed only to prescribe larger doses of democracy").

[11] Any argument that a nonbinding primary would be sufficient to allow individual voters a voice in the nomination process is belied by the fact that such a primary often will be ignored in later, nonprimary delegate-selection processes. In 1980, for example, Vermont's nonbinding open pri-

If one turns to the interests asserted, it becomes clear that they are substantial. As explained by the Wisconsin Supreme Court:

"The state's interest in maintaining a primary and in not restricting voting in the presidential preference primary to those who publicly declare and record their party preference is to preserve the overall integrity of the electoral process by encouraging increased voter participation in the political process and providing secrecy of the ballot, thereby ensuring that the primary itself and the political party's participation in the primary are conducted in a fair and orderly manner.

. . . . . . . . . .

"In guaranteeing a private primary ballot, the open primary serves the state interest of encouraging voters to participate in selecting the candidates of their party which, in turn, fosters democratic government. Historically the primary was initiated in Wisconsin in an effort to enlarge citizen participation in the political process and to remove from the political bosses the process of selecting candidates." 93 Wis. 2d, at 512–513, 287 N. W. 2d, at 536–537 (footnote omitted).

The State's interest in promoting the freedom of voters to affiliate with parties and participate in party primaries has been recognized in the decisions of this Court. In several cases, we have dealt with challenges to state laws restricting voters who wished to change party affiliation in order to participate in a primary. We have recognized that voters have a right of free association that can be impaired unconstitutionally if such state laws become too burdensome. In *Rosario* v. *Rockefeller,* 410 U. S. 752 (1973), the Court upheld a

---

mary produced a lopsided victory, 74.3% to 25.7%, for President Carter over Senator Kennedy. 38 Cong. Q. Weekly Rep. 647 (1980). Party caucuses then produced a state delegation to the Democratic Convention that favored Kennedy over Carter by 7 to 5. *Id.,* at 1472.

registration time limit, but emphasized that the law did not absolutely prevent any voter from participating in a primary and was "tied to a particularized legitimate purpose" of preventing "raiding," [12] *id.*, at 762. In *Kusper* v. *Pontikes,* 414 U. S. 51 (1973), we struck down an Illinois law that prevented voters who had participated in one party's primary from switching affiliations to vote in another party's primary during the succeeding 23 months. We concluded that such a law went too far in interfering with the freedom of the individual voter, and could not be justified by the State's interest in preventing raiding.

Here, Wisconsin has attempted to ensure that the prospect of public party affiliation will not inhibit voters from participating in a Democratic primary. Under the cases just discussed, the National Party's rule requiring public affiliation for primary voters is not itself an unconstitutional interference with voters' freedom of association. *Nader* v. *Schaffer,* 417 F. Supp. 837 (Conn.) (three-judge court), summarily aff'd, 429 U. S. 989 (1976). But these cases do support the *State's* interest in promoting free voter participation by allowing private party affiliation. The State of Wisconsin has determined that some voters are deterred from participation by a public affiliation requirement,[13] and the validity of that concern is not something that we should second-guess.[14]

---

[12] "Raiding" refers to primary voting by members of another party who are seeking to encourage their opponents to select a less desirable or strong candidate. It does not appear to be a problem in Wisconsin. See 93 Wis. 2d, at 506, 287 N. W. 2d, at 533 ("The petitioner and respondents agree that raiding is not a significant problem and that neither the Wisconsin open primary nor the declaration required by Rule 2A prevents 'raiding' ").

[13] A related concern is the prevention of undue influence by a particular political organization or "machine." The Progressives who promoted the idea of a primary election perceived a need to combat political professionals who controlled access to governmental power. See A. Lovejoy,

## III

The history of state regulation of the major political parties suggests a continuing accommodation of the interests of the parties with those of the States and their citizens. In the process, "the States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Storer* v.

La Follette and the Establishment of the Direct Primary in Wisconsin 7–8 (1941) ("avowed purpose" was "the elimination of the boss from the American political scene"); *id.*, at 97 ("Because of their faith in the American people, the Progressives sought to cure the ills of democracy with more democracy. . . . For the first time the middleman was eliminated between the people and their representatives"); Sorauf 203–204. The *open* primary carries this process one step further by eliminating some potential pressures from political organizations on voters to affiliate with a particular party. Although one well may question the wisdom of a state law that undermines the influence of party professionals and may tend to weaken parties themselves, the state interests involved are neither illegitimate nor insubstantial. As noted *supra*, at 133, the Democratic Party of Wisconsin has filed a brief in *support* of the validity of the Wisconsin plan.

[14] A more difficult question in this case is whether Wisconsin can satisfy the second component of the "compelling interest test"—whether it can show that it has no "less drastic way of satisfying its legitimate interests." *Kusper* v. *Pontikes*, 414 U. S. 51, 59 (1973). The answer to this question depends in many cases on how the state interest is conceived. Here, a state interest in protecting voters from the possible coercive effects of public party affiliation cannot be satisfied by any law except one that allows private party affiliation. On the other hand, if the state interest is described more generally, in terms of increasing voter freedom or participation, there may well be less "drastic" alternatives available to Wisconsin. Because of my conclusion that there is no significant burden on the associational freedoms of appellant National Party in this case, and because the Court's analysis does not reach this question, I express no view on whether the State has shown a sufficient interest in this particular method of regulating the electoral process to satisfy a less-drastic-means inquiry.

*Brown,* 415 U. S. 724, 730 (1974).[15] Today, the Court departs from this process of accommodation. It does so, it seems to me, by upholding a First Amendment claim by one of the two major parties without any serious inquiry into the extent of the burden on associational freedoms and without due consideration of the countervailing state interests.

---

[15] The Court concedes that the States have a substantial interest in regulating primary elections. *Ante,* at 124, n. 28, 126. The power of the States in this area derives from the specific constitutional grant of authority to the States to "appoint, in such Manner as the Legislature thereof may direct" Presidential electors, U. S. Const., Art. II, § 1, cl. 2, as well as from the more general regulatory powers of the States. See *Cousins* v. *Wigoda,* 419 U. S. 477, 495–496 (1975) (REHNQUIST, J., concurring in result).