OPINION OF THE COURT
Martin Evans, J.
This election proceeding seeking to validate petitioner’s designating petition arises under New York’s new presidential primary law.
The factual circumstances were established at a hearing (B. William Rothberg, referee). Petitioner seeks to run in the April 3 primary election as a candidate for the party position of delegate from the 16th Congressional District (16th District) to the Democratic National Convention pledged to the Rev. Jessie Jackson. Petitioner filed a statement of candidacy on January 3, 1984, representing that he was seeking election from the 17th Congressional District (17th District). Nevertheless, petitioner circulated and subsequently filed a designating petition for the position of delegate from the 16th Congressional District. *765 Although petitioner testified that he subsequently signed a substitute statement altering the district designation on a date he could not remember, he also testified that he did not personally file it with the Democratic State Committee, the proper repository. He could produce neither a copy of the purported second statement, nor proof that it was timely filed; an employee of the Democratic State Committee testified that no second statement could be located in the Committee’s files.
The question presented is whether the discrepancy in district designation between the statement and the petition is a fatal defect which in and of itself disqualifies petitioner as a candidate, despite his filing of an apparently otherwise valid designating petition.
i
The current presidential primary law (L 1983, ch 1000, approved Sept. 20, 1983, amdg Election Law, § 2-122) provides a comprehensive scheme for candidate selection while according to the State committee of each political party considerable latitude to adopt rules governing the election of delegates and alternates to its nominating convention. Like its predecessor statute which governed delegate selection in the 1980 presidential election (L 1979, ch 731) the current law balances the needs of certainty and legislative supervision with those of party autonomy.* The current law, like its predecessor, is an enabling act, which provides a broad framework for the conduct of the primaries to which the local party rules must conform, while *766 allowing each party wide discretion to shape its own procedures. In so doing, it recognizes that a political party has both a quasi-public function in candidate selection and election administration (see Smith v Allwright, 321 US 649) and an essentially private, associational one, in which it must be free to acknowledge and represent both the often competing viewpoints and the common interests of its members (see Democratic Party of U. S. v Wisconsin, 450 US 107).
In determining this proceeding, the court must interpret the Election Law in pari materia with the applicable rules of the Democratic Party. In the absence of proof of unconstitutionality or other illegality (e.g., racial or religious discrimination), a party is free to adopt reasonable rules for the conduct of its candidate selection process. Thus, a party is free to limit voting in its primary to its own members. (See Democratic Party of U. S. v Wisconsin, supra.) Such a party rule must be honored over a conflicting State law, as a consequence of the First Amendment derived right to freedom of political association. Similarly, this court is bound to give effect to the applicable party rules, both as a matter of Federal constitutional law and as a matter of clear statutory intent. The statute was written to conform to the requirements of Wisconsin, and accordingly recognizes the parties’ rule-making authority.
Under the new system, to be used in the April 3 Democratic primary, Democratic enrollees in each Congressional district will vote in two different elections: (1) a poll among the national candidates for the presidential nomination, which will substantially determine delegate apportionment among the national candidates; and (2) a poll among competing local candidates for delegate and alternate positions. Local delegate candidates will be denoted on the ballot as being pledged to a national candidate or uncommitted.
Section 3 (subd 7, par a) of chapter 1000 of the Laws of 1983 enables a State committee to promulgate a rule which provides that “no candidate for the positions of delegate and alternate delegate may appear on the ballot as pledged to support a particular presidential candidate, or as uncommitted, unless the name of such candidate for such *767 position appears on a certificate listing the names of those candidates for such positions who have filed statements of candidacy for such positions with the secretary of the state committee”.
The Democratic Party rules so provide. (Art I, § 3, subd C, pars [2], [4].)
In order to be eligible to appear on the ballot as a candidate for district delegate or alternate, a prospective candidate must satisfy the requirements of both the Election Law and the party rules. Failure to comply with either is a disqualification. Thus, a candidate must file a valid statement of candidacy with the State committee and otherwise conform to party rules, and circulate and file a proper designating petition, containing a sufficient number of valid signatures, and otherwise conform to the Election Law.
The statement of candidacy must contain, inter alia, the number of the Congressional district in which the prospective candidate intends to run. The secretary of the State committee files a certification with the Board of Elections listing by Congressional district the names of all those persons who filed statements of candidacy. The filing of a valid statement of candidacy listing the correct Congressional district is therefore a condition precedent to a permissible candidacy.
This requirement is neither a mere technicality nor obeisance to arid formalism. It is not an unprejudicial defect which the court is free to overlook. Since the Democratic Party’s right to adopt such a rule is one of constitutional dimension, it cannot be easily disregarded. Having been prospectively incorporated by reference into the Election Law, it is effectively a statutory requirement; the breach of similar statutory requirements has been considered a fatal defect. (See Matter of Alamo v Black, 51 NY2d 716; Matter of Hutson v Bass, 54 NY2d 772.)
Most significantly, judicial intervention here would prejudice substantial rights of others and might unconstitutionally upset the delicate balance of interests protected by the interrelated statute and party rules. For example, a presidential candidate has the right to approve or reject the names of local delegate candidates who filed state *768 ments of candidacy. (See L 1983, ch 1000, § 7, subds a, c.) The statement of candidacy serves as notice to the presidential candidate and permits him to review the qualifications and suitability of those who put themselves forward as his representative. If a local candidate is permitted to bypass the process, a presidential candidate would be deprived of a measure of authority over his own campaign which both statute and party rule agree he should have. To grant the petition here would deprive Rev. Jackson of the opportunity to screen his delegates for loyalty to his candidacy, suitability for representation of a particular geographical area, and for other factors. It would unreasonably treat petitioner differently than other possible candidates who obeyed the law and went through the process. Indeed, other prospective Jackson-pledged candidates may have been misled in each district as to the identity of their opposition. The court has the inherent power to disregard procedural defects if necessary to protect a party’s constitutional rights (see, generally, Evans and Stallman, Deferred Sentence: Common Law Alternative to Judge’s Dilemma, NYLJ, Nov. 24, 1982, p 6, cols 1, 2 [“Inherent Power”]). It cannot disregard seemingly trivial, even inadvertent, procedural defects or omissions where to do so would prejudice the rights of another person. Therein lies a correct definition of the term “fatal defect”.
The court concludes that the petitioner cannot be certified as a candidate in either district, since in neither district did he file both a proper statement of candidacy and a valid designating petition.
No statement was filed in the 16th District; no petition was filed in the 17th District. The question posed is answered in the affirmative.
n
Even if the discrepancy in district designation were not a fatal defect, the court would be constrained to dismiss this proceeding as not having been timely commenced.
By a letter dated February 21, 1984, addressed to the first named member of petitioner’s committee on vacancies, the Board of Elections informed petitioner that the discrepancy disqualified his petition, even in the apparent *769 absence of any filed objections. Petitioner denied receipt of the Board’s letter, but admits to having learned of the adverse determination on either Wednesday, March 7, or Thursday, March 8, 1984. Indeed, his petition to validate, upon which this proceeding has been brought, was verified on Thursday, March 8. The order to show cause, however, was not obtained until the following Monday, March 12. Not only did petitioner fail to timely commence a validation proceeding within the permissible statutory period (i.e., within 14 days after February 16, the last day for filing a designating petition; see Election Law, § 16-102, subd [2]; 1984 New York Political Calendar; New York City Board of Elections, Rules for Democratic Designating Petitions, Jan. 10,1984, p 2); he offers no excuse for failing to institute a proceeding immediately upon learning of the adverse administrative determination.
An election proceeding can be brought even after the expiration of the statutory period when notice of the Board of Elections’ adverse determination is itself received after the expiration of the statutory period, and the proceeding is commenced immediately upon receiving such notice. (See Matter of Pell v Coveney, 37 NY2d 494 [proceeding commenced the same day notice obtained].) A proceeding commenced on a Monday, where notice was received the preceding Thursday, has been held untimely. (Cordero v Maldonado, 89 AD2d 975.) Here, the referee found a “likelihood” that petitioner had notice even earlier, at least by the prior Wednesday. The rubric of Pell is based, as was the intent of the statute, on a wise balance between fairness and necessity. The 14-day statutory period is designed to enable aggrieved candidates and citizens to review adverse administrative determinations, but compels them to do so on an expedited basis consonant with the exigencies of the political calendar. Candidates, campaign staffs and voters must have adequate notice of who is actually running; the Board of Elections, in particular, must have an adequate period of time to print ballots and make logistical preparations for the conduct of the election. Pell recognized that, where the Board of Elections determination is rendered so that notice of an adverse determination cannot be obtained until after the expiration of the 14-day statutory period, *770 the statutory intent of permitting prompt review would be frustrated, were the courts to apply the statute literally. Given the evidence here, it is clear, from the date of his petition that petitioner, as early as Thursday, knew that he must seek judicial intervention. His four-day hesitation before obtaining an order to show cause evinces the absence of the diligence and alacrity which the law requires. Judicial intervention under these circumstances would be improper.
The motion to dismiss is accordingly granted; the petition is dismissed.

 Prior to 1979, the selection process was governed largely by party rules, within a loose statutory context. (See Election Law, former § 2-122.) It permitted a party to choose to select its delegates either exclusively in Congressional district primaries, or partly by primary and partly by either a State convention or the State committee. It made no provision for a preference poll, whether binding or advisory, among the national presidential candidates. Neither did it provide for the listing on the ballot of the names of presidential candidates to whom individual delegate candidates were pledged. In 1976, delegates were listed for the first time, on the New York Democratic ballot, as pledged to a specific candidate or as uncommitted, but only because of a new party rule. In 1979, the Legislature adopted a comprehensive alternate procedure, for use only in the 1980 election, where the existing law conflicted with national party rules. (See L 1979, ch 731.) This procedure, necessitated by the then new rules of the national Democratic Party, since repealed, provided for a State-wide preference poll of national candidates, which determined the number of delegates allotted to each candidate. Delegate selection took place in both the State committee (for State-wide at large delegates) and in district caucuses of each national candidate’s supporters. The procedure was used only in the Democratic Party.