**Zolton FERENCY, Plaintiff-Appellant,**

v.

**Richard H. AUSTIN, Secretary of State; Bernard Apol, Director, Elections Division, Department of State and Board of State Canvassers, Defendants-Appellees.**

No. 80–1382.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 22, 1981.

Decided Dec. 7, 1981.

Zolton Ferency, pro se.

Frank J. Kelley, Atty. Gen., Jann Ryan Baugh, Haywood W. Julian, Michael Hodge,

Asst. Attys. Gen., Lansing, Mich., for defendants-appellees.

Theodore Sachs (correspondence only) Detroit, Mich., for Mich. Democratic Party, amicus curiae.

Before WEICK and BROWN, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

BAILEY BROWN, Circuit Judge.

The appellant, Zolton Ferency, an attorney representing himself, and who is "a duly elected and serving precinct delegate, a registered elector and a duly elected and serving member of the Executive Committee of the Ingham County [Michigan] Democratic Committee," brought this action against the Michigan Secretary of State, the Director of the Election Division of the Department of State and the State Board of Canvassers, appellees, to obtain a declaration that delegates to the Democratic National Convention from Michigan in 1980 must be selected in accordance with the results of a presidential primary as required by a Michigan statute. Ferency also sought a declaration that the appellees were required to enforce this Michigan statute with respect to the method of selecting delegates to the Convention. Further, he contended that, in any event, he was entitled to a declaration that a system of party caucuses for selection of delegates adopted by the Michigan Democratic Party was unconstitutional. Ferency had sought, without success, a ruling from appellees that the Michigan Democratic Party was obliged to comply with the statute, and the State Attorney General had ruled that this Michigan statute dealing with delegate selection could not be enforced against the Democratic Party because of the decision of the Supreme Court in *Cousins v. Wigoda*, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975). Moreover, on December 10, 1979, the Michigan Democratic Party had formally advised the Secretary of State that it would not comply with the statute prescribing the method of selecting delegates to the 1980 Convention. Ferency initially filed this action in state court from which it was re-moved on March 25, 1980 to the District Court, 493 F.Supp. 683, for the Western District of Michigan on the ground that Ferency in part relied on federal constitutional claims.

The district court, Hillman, J., gave this matter expedited treatment since Michigan's presidential primary election would take place on May 20, 1980. The Michigan Democratic Party was allowed to intervene as *amicus* to support the position of defendants. It was conceded at oral argument on Ferency's motion for issuance of a declaratory judgment pursuant to 28 U.S.C. § 2201 that the facts were not in dispute and that therefore the court could properly rule without further development of the record. On April 21, 1980, Judge Hillman ruled that Ferency was not entitled to the declaratory judgment that he sought, dismissed the complaint, 493 F.Supp. 683 (1980), and Ferency appealed. We agree with the district court and therefore affirm.

Under the Michigan statutory scheme (Mich.Comp.Laws Ann. § 168.613 et seq.), on the third Tuesday in May, 1980, a statewide presidential primary election would be conducted for each political party that received more than 5% of the total vote cast nationwide in the last presidential election year. During the preceding March, the Secretary of State was required to issue a list of individuals indicated by the media to be potential presidential candidates for each such party's nomination. Also, the State Central Committee of each such party was required to file with the Secretary of State a list of additional individuals considered by it to be potential presidential candidates of its party. The ballots, in addition to containing the names of the candidates, also would contain a space for an elector to vote uncommitted. It was required that National Convention delegates be selected on a basis that insured that the proportion of the total National Convention delegation that was committed to each presidential candidate or that was uncommitted equaled as nearly as practicable the proportion of the popular vote that was cast for each presidential candidate or was cast as uncommit-

ted in the party's presidential primary. Convention delegates were bound to vote for the candidate for whom they were so committed until the end of the second ballot unless released by withdrawal of the candidate from contention or until released in writing by the candidate directed to the chairman of the Convention.

Further, the Michigan presidential primary is an open primary in that any individual may vote for a candidate of any party on the ballot; thus, for example, a Republican may vote for a candidate in the Democratic primary and a Democrat may vote for a candidate in the Republican primary without in any manner making a prior declaration as to party affiliation. This is referred to in the record as "crossover voting."

As a result of crossover voting perceived to have occurred in Michigan and other states in the 1972 and 1976 presidential primaries causing certain Democratic candidates to receive a large number of votes from voters who were not Democrats, Rule 2 of the Delegate Selection Rules for the 1980 Democratic National Convention provided that participation in the delegate selection process in primaries or caucuses would be limited "to Democratic voters only who publicly declare their party preference and have their preference publicly recorded." The Rule further required a state party that was prevented by statute from complying with this Rule to adopt and implement a delegate selection system that complied with this Rule.

In August, 1979, the Michigan State Democratic Party adopted its 1980 delegate selection plan. This plan provided for a delegate selection procedure in the event that the Michigan statute was amended to allow compliance with the National Delegate Selection Rules. It also provided that, in the event that the statute was not so amended, a procedure would be followed that would comply with the National Delegate Selection Rules, that is, provided that delegates would be selected by party caucuses. As heretofore indicated, the Secretary of State was formally advised on De-

cember 10, 1979 that, since the Michigan statute had not been amended to allow compliance with Delegate Selection Rules of the Democratic National Convention, the Michigan Democratic Party would not comply with the statute, would select delegates in party caucuses, and would request that Democratic candidates for president withdraw from the Michigan Presidential Primary ballot.

■ Appellees and the Michigan Democratic Party, as *amicus*, argue that this appeal should be dismissed since, they contend, the case has become moot. They so contend even though the Michigan statute governing the selection of delegates for national conventions is still in effect and the aforesaid Rules for Delegate Selection of the National Democratic Party are not shown to be repealed. It is true, of course, as appellees and *amicus* point out, that the Democratic National Convention of 1980, which was the focus of the litigation in the district court, has taken place. Even so, this controversy is "capable of repetition yet evading review," *Democratic Party of the United States v. LaFollette*, 450 U.S. 107, 114, 101 S.Ct. 1010, 1015, 67 L.Ed.2d 82, 90 n. 13 (1981), and thus it is not moot.

■ We conclude that, in the light of the decisions of the Supreme Court in *Cousins v. Wigoda*, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) and in *LaFollette, supra,* the Michigan statute could not be enforced so as to control the method of selection of Michigan delegates to the Democratic National Convention.

The *Cousins* litigation involved the 1972 Democratic Convention. In the March, 1972, Illinois primary election, Chicago's Democratic voters elected 59 delegates (the Wigoda delegates) to the 1972 Democratic National Convention to take place in July, 1972. At the Convention, a competing delegation from Chicago (the Cousins delegates) challenged the seating of the Wigoda delegates before the Credentials Committee on the ground that the slate-making procedures under which the Wigoda delegates were selected violated Party guidelines as set out in the Call of the Convention. On

June 30, 1972, the Credentials Committee sustained the decision of a hearing officer that the Wigoda delegates had been selected in violation of the guidelines, and it also accepted the hearing officer's recommendation that the Wigoda delegates be unseated and the Cousins delegates seated.

On July 8, 1972, two days before the Convention opened, the Wigoda delegates had obtained from the Circuit Court of Cook County, Illinois, an injunction prohibiting the Cousins delegates from so acting at the Convention. Nonetheless, when the Convention on July 10 seated the Cousins delegates, they participated as delegates throughout the Convention. As a result, a proceeding was brought in the Circuit Court of Cook County to have the Cousins delegates adjudged to be in criminal contempt. The Illinois Appellate Court affirmed the injunction, 14 Ill.App.3d 460, 302 N.E.2d 614 (1973), and the Supreme Court of Illinois, without opinion, denied leave to appeal. The Appellate Court held, succinctly stated, that "[t]he right to sit as a delegate representing Illinois at the national nominating convention is governed exclusively by the Illinois Election Code." 302 N.E.2d at 626.

On review, the Supreme Court of the United States recognized that the Illinois Appellate Court had justified the injunction on the ground that the interest of the state in protecting the right to participate in primaries is superior to any interest that the political parties might desire to protect. The Court concluded, however, that in view of the fact that the function of the Convention is to choose presidential and vice-presidential candidates, which are national offices, the right of the National Democratic Party and its adherents to freedom of association under the First and Fourteenth Amendments must be given paramount effect. 419 U.S. at 488–90, 95 S.Ct. at 547–549.

The decision in *Democratic Party of the United States v. LaFollette*, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981), is even more in point. It involves the same Rules for selection of delegates for the 1980 Democratic National Convention as are involved in the instant case. The Wisconsin statutory scheme with respect to delegate selection and delegate obligation was not precisely the same as Michigan's but it, for present purposes, may be so treated and was in conflict with Rule 2 of the Delegate Selection Rules of the 1980 Democratic National Convention because Wisconsin also allows crossover voting in its presidential primary.

In May, 1979, the Democratic Party of Wisconsin submitted to the Compliance Review Commission of the National Party its plan for selecting delegates to the 1980 Convention. The plan followed the mandate of Wisconsin law, and the Commission disapproved the plan as being in violation of Rule 2. The National Party thereafter indicated that if Wisconsin delegates were selected in accordance with such plan, they would not be seated.

The Wisconsin Attorney General then filed an original action in the Wisconsin Supreme Court on behalf of the State. The National Party and Democratic National Committee, appellants in the Supreme Court of the United States, were named as respondents. Also named as a respondent was the State Party, an appellee in the Supreme Court. The State sought a declaration that the Wisconsin delegate selection system was constitutional as applied to the National Party and National Committee and that they could not lawfully refuse to seat Wisconsin delegates at the Convention. The State Party responded by agreeing that state law may be validly applied against the National Party and cross-claimed against the National Party, seeking an order requiring the National Party to seat the Wisconsin delegation. The National Party contended that under the First and Fourteenth Amendments it could not be required, in violation of Party rules, to seat the Wisconsin delegation. The Wisconsin Supreme Court held and declared that the State's system of selecting delegates was constitutional and binding on the National Party and National Committee. 93 Wis.2d 473, 287 N.W.2d 519 (1980). On review, the Supreme Court of the United States reversed.

In its opinion (per Stewart, J.), the Court stated the issue presented as follows:

> The question in this case is not whether Wisconsin may conduct an open primary election if it chooses to do so, or whether the National Party may require Wisconsin to limit its primary election to publicly declared Democrats. Rather, the question is whether, once Wisconsin has opened its Democratic presidential preference primary to voters who do not publicly declare their party affiliation, it may then bind the National Party to honor the binding primary results, even though those results were reached in a manner contrary to National Party rules.
>
> The Wisconsin Supreme Court considered the question before it to be the constitutionality of the "open" feature of the State primary election law, as such. Concluding that the open primary serves compelling state interests by encouraging voter participation, the court held the state open primary constitutionally valid. Upon this issue, the Wisconsin Supreme Court may well be correct. In any event, there is no need to question its conclusion here. For the rules of the National Party do not challenge the authority of a State to conduct an open primary, so long as it is not binding on the National Party Convention. The issue is whether the State may compel the National Party to seat a delegation chosen in a way that violates the rules of the Party. And this issue was resolved, we believe, in *Cousins v. Wigoda*, 419 U.S. 477 [95 S.Ct. 541, 42 L.Ed.2d 595].

450 U.S. at 120, 101 S.Ct. at 1018, 67 L.Ed.2d at 94 (footnotes omitted).

The Court then stated its rationale for its decision as follows:

> The *Cousins* Court relied upon the principle that "[t]he National Democratic Party and its adherents enjoy a constitutionally protected right of political association." 419 U.S., at 487 [, 95 S.Ct., at 547]. See also, *id.*, at 491 [, 95 S.Ct., at 549] (Rehnquist, J., concurring). This First Amendment freedom to gather in association for the purpose of advancing shared beliefs is protected by the Fourteenth Amendment from infringement by any State. *Kusper v. Pontikes*, 414 U.S. 51, 57 [, 94 S.Ct. 303, 307, 38 L.Ed.2d 260]; *Williams v. Rhodes*, 393 U.S. 23, 30–31 [, 89 S.Ct. 5, 10, 21 L.Ed.2d 24]. See also *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 [, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488]. And the freedom to associate for the "common advancement of political beliefs," *Kusper v. Pontikes, supra*, necessarily presupposes the freedom to identify the people who comprise the association, and to limit the association to those people only. "Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 [, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311]; see *NAACP v. Button*, 371 U.S. 415, 431 [, 83 S.Ct. 328, 337, 9 L.Ed.2d 405].
>
> Here, the members of the National Party, speaking through their rules, chose to define their associational rights by limiting those who could participate in the processes leading to the selection of delegates to their national convention. On several occasions this Court has recognized that the inclusion of persons unaffiliated with a political party may seriously distort its collective decisions—thus impairing the Party's essential functions—and that political parties may accordingly protect themselves "from intrusion by those with adverse political principles." *Ray v. Blair*, 343 U.S. 214, 221–222 [, 72 S.Ct. 654, 657–658, 96 L.Ed. 894]. In *Rosario v. Rockefeller*, 410 U.S. 752 [, 93 S.Ct. 1245, 36 L.Ed.2d 1], for example, the Court sustained the constitutionality of a requirement—there imposed by a state statute—that a voter enroll in the party of his choice at least 30 days before the general election in order to vote in the next party primary. The purpose of that statute, "[w]as to inhibit party 'raiding,' whereby voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the other party's primary." *Id.*, at 760 [, 93 S.Ct., at 1251].

See also *Kusper v. Pontikes, supra,* 414 U.S., at 59–60 [, 94 S.Ct., at 308–309].

450 U.S. at 120–121, 101 S.Ct. at 1018–1019, 67 L.Ed.2d at 94–95 (footnotes omitted). And the Court further stated its rationale as follows:

> We must consider, finally, whether the State has compelling interests that justify the imposition of its will upon the appellant. *See Cousins, supra,* 419 U.S. at 489, 95 S.Ct. at 548. "Neither the right to associate nor the right to participate in political activities is absolute." *CSC v. Letter Carriers,* 413 U.S. 548, 567 [, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796]. The State asserts a compelling interest in preserving the overall integrity of the electoral process, providing secrecy of the ballot, increasing voter participation in primaries, and preventing harassment of voters. But all those interests go to the conduct of the presidential preference primary—not to the imposition of voting requirements upon those who, in a separate process, are eventually selected as delegates. Therefore, the interests advanced by the State do not justify its substantial intrusion into the associational freedom of members of the National Party.

450 U.S. at 124, 101 S.Ct. at 1020, 67 L.Ed.2d at 96–97 (footnotes omitted).

Ferency further contends that, in any event, prescribing rules for and conducting caucuses for the selection of delegates to the Democratic National Convention by the Michigan Democratic Party is "state action." From this, Ferency appears to argue that, in shutting out some from the delegate selection process, he and others are denied some federal constitutional right. In any case, he does not specify any other aspect of the selection of delegates by caucuses as being illegal. We gather that, although Ferency is not specific, the denial to which he refers is denial of privileges and immunities and equal protection.

The Supreme Court has never decided whether such activity as that of the Michigan Democratic Party in prescribing rules for and conducting caucuses for selection of delegates to a National Convention is "state action." In *Cousins, supra,* the Court noted that it was not an issue there and was not decided. 419 U.S. 477 at 483, n.4, 95 S.Ct. 541 at 545, 42 L.Ed.2d 595.

 We need not here decide whether the activity of the Michigan Democratic Party amounts to "state action" because, even if it were, Ferency has shown no violation of his federal constitutional rights. In the first place, it is implicit in the *Cousins* and *LaFollette* opinions that the exclusion of non-Democratic voters from the delegate selection process of the Democratic Party does not constitute a denial of any federal constitutional right. Moreover, in *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1972), the Court considered a New York statute that provided, *inter alia,* that, in order to vote in a party primary, one had to enroll as a member of that party at least thirty days prior to the general election preceding the primary election. The Court held that the statute was not unconstitutional since it did not disenfranchise plaintiffs or any class, it did not violate plaintiffs' first and fourteenth amendment right to freedom of association with the political party of their choice, and the time limitation was not so onerous a burden as to deprive plaintiffs of the franchise or of their freedom of association. Therefore a reasonable limitation may be imposed by statute (and thus clearly by state action) on even a party member's right to participate in the party's primary.

The decision of the district court is affirmed.