Jesse JACKSON, Clyde Cleveland, Joel Ferguson, Robert Newby, Sam Riddle, Jr. and Kathleen Wilson, Plaintiffs,

v.

The MICHIGAN STATE DEMOCRATIC PARTY and The Democratic Party of the United States, Defendants.

Civ. A. No. 84CV1096DT.

United States District Court, E.D. Michigan, S.D.

Sept. 10, 1984.

Milton R. Henry, Godfrey J. Dillard, Detroit, Mich., for plaintiffs.

Theodore Sachs, Detroit, Mich., for Defendant, Michigan State Democratic Party.

John C. O'Meara, Joseph C. Marshall, III, Detroit, Mich., for Democratic Party of the United States.

## MEMORANDUM OPINION

ANNA DIGGS TAYLOR, District Judge.

### INTRODUCTION

On March 9, 1984, plaintiffs Jesse Jackson, Clyde Cleveland, Joel Ferguson, Rob-

ert Newby, Sam Riddle, Jr., and Kathleen Wilson filed their complaint in this action against defendants the Michigan State Democratic Party (State Party) and the Democratic Party of the United States (National Party). On the same date, plaintiffs filed a motion which requested that the court issue an order to show cause why injunctive relief should not be granted in accordance with their prayer for relief in the complaint.

On March 13, 1984, before defendants answered or otherwise responded to the complaint,[1] plaintiffs filed an amended complaint which prayed for substantially identical relief.

On March 16, 1984, a hearing was held on plaintiffs' motion for an order to show cause. After hearing oral argument and considering the evidence presented at the hearing, the court denied plaintiffs' motion from the bench. An order denying the motion was entered on April 25, 1984. On May 7, 1984, after hearing, an order granting motions of both defendants for summary judgment and to dismiss was entered.

Although the court rendered opinions from the bench and thereafter entered orders consistent therewith, this written opinion will memorialize the court's reasons for denying plaintiffs' request that the Michigan Democratic Caucuses be enjoined, and for thereafter dismissing the lawsuit.

### THE COMPLAINT

Plaintiffs' first amended complaint, filed on March 13, 1984, seeks to invoke this court's jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4). Plaintiffs allege that defendants have deprived them of rights guaranteed by the First, Fifth, Fourteenth and Fifteenth Amendments of the United States Constitution, in violation of 42 U.S.C. §§ 1983 and 1985.

The allegations of the amended complaint are summarized in depth below. Missing, but clearly intended allegations, are supplied by the court in brackets. References to specific paragraphs of the amended complaint are made as follows: (Compl. ¶ ____).

"Plaintiff Jackson is a black citizen of the United States and the State of Illinois, a member of the National Party, and a candidate for President of the United States, who is seeking the nomination of the Democratic Party for that office through participation in various state primaries and caucuses, including the Michigan State Caucuses scheduled to be held on March 17, 1984. (Compl. ¶ 2.)

"The remaining plaintiffs are residents of the State of Michigan, residing in different cities. They are registered voters who intend to vote in the Caucus and to comply with all the qualifying rules enacted by the State Party for participation in the Caucus. Moreover, these plaintiffs are supporters of plaintiff Jackson's candidacy for President of the United States. (Compl. ¶ 3.)

"The National Party is responsible for the adoption of nation-wide rules providing for the selection of delegates to the Democratic National Convention, at which the Democratic Party will nominate its candidate for President of the United States. The National Party is also responsible for the adoption of rules on a nation-wide basis providing for the holding of closed state primaries, or state caucuses, limited to Democrats who have declared their party preference, or whose preference is publicly recorded. (Compl. ¶ 4.)

"The State Party's implementation of the National Party's rules resulted in a set of rules making the State of Michigan a caucus state and provided for the holding of the Caucus. (Compl. ¶ 4A.)

"Under the State Party's rules, all participants in the Caucus must sign a certificate containing the following information: name, address, a statement that the person is a registered voter or will be 18 years of age and registered to vote on or before November 6, 1984, a statement that the

---

1. F.R.Civ.P. 15(a) provides in pertinent part:
   A party may amend his pleadings once as a matter of course at any time before a respon- sive pleading is served or, ...

person is a Democrat, and the person's preference or uncommitted status. (Compl. ¶ 5.)

"Caucus Rule D.1 [2] provides that delegates to the Democratic National Convention must be selected and allocated by the state chairperson of the State Party 'in proportion to the percentage vote received;' but only candidates who receive 20% of the votes cast in any one of 18 state congressional districts [are eligible to be awarded delegates]. (Compl. ¶ 6.)

"Caucus Rule I(F)1 [3] provides that the presidential preference of the Michigan delegation to the Democratic National Convention will be determined by the Caucus and contains guidelines to be followed by the state chairperson in making the final allocation. (Compl. ¶ 7.)

"Plaintiffs allege that the 'foregoing scheme for counting the votes cast by individual voters,' presumably specifically referring to Caucus Rules I–D–1 and I–F–1, violates the equal protection and due process clauses of the United States Constitution 'by bringing about disproportionate vote weighting.' Plaintiffs also allege that the 'scheme' is similar to the scheme 'outlawed' in *Gray v. Sanders*, 372 U.S. 368 [83 S.Ct. 801, 9 L.Ed.2d 821] (1963), and violates the principle of one man, one vote. (Compl. ¶ 8.)

"Plaintiffs allege that the majority of areas where black people live are assigned, pursuant to Rule B,[4] more than 5 delegates,

**2.** Rule I–D–1 of the 1984 Michigan Democratic Party Delegate Selection and Affirmative Plan provides:

D. PROPORTIONAL REPRESENTATION AND THRESHOLDS OF SUPPORT

1. Michigan is a caucus state. Accordingly, delegates and alternates shall be allocated so as to fairly reflect the expressed presidential preference or uncommitted status of the caucus participants in each district. Therefore, the National Convention delegates elected at the district level shall be allocated in proportion to the percentage of the caucus vote won in that district by each preference, except that preference falling below the presidential preference threshold shall not be awarded any delegates. The threshold for each district shall be 20%.

**3.** Rule I–F–1 of the 1984 Michigan Democratic Party Delegate Selection and Affirmative Action Plan provides:

F. PRESIDENTIAL PREFERENCE CAUCUSES

1. ALLOCATION OF DELEGATES BY PRESIDENTIAL PREFERENCE

The presidential preference of the Michigan delegation will be determined by caucuses of Democrats conducted by the Michigan Party on Saturday, March 17, 1984.

a. The state chairperson shall officially inform each district chairperson by Friday, April 6, 1984 of the final delegate allocation by presidential preference for each district.

b. In making the final allocation, the state chairperson shall follow the following guidelines:

(1) Multiply the percentage support received for each candidate in each portion of a county within the congressional district by that portion of the county's state allocated delegate vote. (See Appendix B.)

(2) Add together each preference's resulting figures for each district.

(3) Prorate the resulting figures for each preference which did not receive at least the threshold support within the district to the preferences which did received the threshold support.

(4) Add together figures for each preference.

(5) Compute the percentage each preference makes up of this total figure.

(6) Multiply this percentage by the number of delegates (or alternates) allocated to the district.

(7) The resulting figure to the left of the decimal point for each preference is that preference's delegate (or alternate) allocation.

(8) Any extra delegates (or alternates) shall be allocated by comparing that portion of the resulting numbers to the right of each decimal point and allocating the extras starting with the largest number to the right of any decimal point and allocating delegates (or alternates) until all have been allocated. .

**4.** Rule I–B of the 1984 Michigan Democratic Party Delegate Selection and Affirmative Action Plan provides:

B. APPORTIONMENT OF DELEGATES TO DISTRICTS

1. The 93 delegates and 31 alternates are apportioned to the districts as follows:

| | DELEGATES | ALTERNATES |
|---|---|---|
| 1st Congressional District | 8 | 3 |
| 2nd Congressional District | 5 | 2 |
| 3rd Congressional District | 5 | 2 |
| 4th Congressional District | 4 | 1 |

and that districts having more than 5 delegates suffer diminution of voting power. (Compl. ¶ 9.)

"Plaintiffs allege that the delegate selection scheme pairs areas of large black population with predominantly white areas and violates the Fifteenth Amendment of the United States [Constitution]. (Compl. ¶ 10.)

"In paragraph 11 and 12 of the amended complaint, plaintiffs make several conclusory legal allegations. The court will not summarize those conclusions here, but will set forth paragraph 11 below.

"Plaintiffs allege that the 'threshold limits' contained in the Michigan Caucus Rules are constitutionally void, and may not be applied to limit the 'full count of votes' received by plaintiff Jackson in the Caucus. Plaintiffs further allege that the 'unit system of voting' described in the Michigan rules, 'unfairly weighs against the power of the vote to be given Jesse Jackson by black voters, whose concentration of power are to be found in large metropolitan areas' of several specified Michigan cities. Plaintiffs further allege that the voting power of blacks 'has been so weighted as to constitute a substantial denial of the franchise to black voters, and the benefit of their vote' to plaintiff Jackson. Plaintiffs allege that these effects constitute violations of the First, Fifth, Fourteen, and Fifteenth Amendments of the United States Constitution. (Compl. ¶ 13.)

"Plaintiffs allege that the following 'restrictions' are 'totally unconstitutional and unenforceable' within the meaning of 42 U.S.C. §§ 1983 and 1985(3):

"a) requiring the voter to identify himself on the same document as his presidential preference;

"b) permitting [congressional] districts 1, 13, 14, 15, 16, and 17 to establish voting locations which are not sufficient in number to handle the voting needs of 3 to 6 million voters;

"c) establishing voting hours for all caucuses which are so short as to render it impossible for 3 to 6 million voters to vote in the polling places alloted;

"d) permitting too few polling places to be established 'to accommodate the numbers of person[s] who might be expected to vote for the plaintiff Jesse Jackson, and particularly for the elderly ...;'

"e) not providing for and prohibiting absentee ballots and proxy votes. (Compl. ¶ 14.)

"On information and belief, plaintiffs allege that the State Party has printed less than 200,000 ballots, for an expected 'electorate' of 3 to 6 million voters. (Compl. ¶ 15.)

"Plaintiffs allege that they 'have been informed' that the ballots have been open to seizure by party members, thereby 'opening the door to ballot stuffing, and advance preparations of ballots, which may well be used to compromise the integrity of the election.' (Compl. ¶ 16.)

|  | Delegates | Alternates |
|---|---|---|
| 5th Congressional District | 5 | 1 |
| 6th Congressional District | 5 | 2 |
| 7th Congressional District | 5 | 2 |
| 8th Congressional District | 5 | 2 |
| 9th Congressional District | 4 | 1 |
| 10th Congressional District | 4 | 1 |
| 11th Congressional District | 6 | 2 |
| 12th Congressional District | 5 | 2 |
| 13th Congressional District | 7 | 2 |

|  | Delegates | Alternates |
|---|---|---|
| 14th Congressional District | 6 | 2 |
| 15th Congressional District | 4 | 1 |
| 16th Congressional District | 5 | 2 |
| 17th Congressional District | 6 | 2 |
| 18th Congressional District | 4 | 1 |

2. The above apportionment is based upon a formula giving equal weight to the vote for Democratic candidates in the 1980 Presidential election and the 1982 Michigan gubernatorial election. (That formula is attached as Appendix "A".)

"Plaintiffs alleged that the actions of the State Party described in the complaint are state actions taken under color of law. (Compl. ¶ 17.) Plaintiffs do not make such an allegation in the amended complaint with respect to the National Party.

"Plaintiffs allege that because the electorate has a right to vote in an election in which 'secrecy is a necessary sine qua non,' and because there is a necessity to preserve the fundamental integrity of the franchise, the rules [plaintiffs presumably refer here to the 1984 Michigan Democratic Party Delegate Selection and Affirmative Action Plan] are unconstitutional. (Compl. ¶ 18.)

"Plaintiffs allege that they, as well as many voters in Michigan, are fearful of the consequences of casting an open, non-secret, ballot for plaintiff Jackson, where the 'party regulars' of Michigan, and the labor unions in Michigan, have openly endorsed the candidacy of Walter Mondale, and 'their obvious frustration over Walter Mondale's poor showing in prior caucuses and primaries can well lead to reprisals for voting in favor of plaintiff, Jesse Jackson.' (Compl. ¶ 19.)

"Plaintiffs alleged that prior to filing their complaint, challenges to the open ballot and delegate allotment process have been brought to the attention of the National Party and State Party, but that both defendants have refused to modify 'the Rules' to accommodate the objections of the plaintiffs herein. (Compl. ¶ 20).

"Plaintiffs state in paragraph 21 of the amended complaint, that the court should 'grant immediate relief, or grant injunctive relief staying the caucuses,' pending a ruling upon the constitutionality of the Michigan Caucus Rules.

"In paragraph 22 of the amended complaint, plaintiffs allege that unless the court grants immediate relief, they will suffer serious and irreparable injury. The relief requested by plaintiffs in the prayer of the amended complaint is the following:

"a) That the court issue an immediate Order to Show Cause, requiring the defendants, Democratic Party of the United States, and the Michigan State Democratic Party, to show cause, if any cause there be why they should not forthwith modify their Caucus Rules for the conduct of the March 17, 1984 Presidential Preference Caucus, so as to eliminate the non-secret ballot; the weighted voting tally of votes; the restriction of polling places and times and ballots; and the bar to absentee voting, or why the Rules providing for such practices should not forthwith be declared on their face to be unconstitutional and void; and to show, in the alternative, why the caucus set for March 17, 1984, should not be adjourned until such date as full compliance with the requirements of the Constitution of the United States and the Law of the Land, can be assured in relation to the conduct of any Presidential Preferential Caucus within the State of Michigan.

"Plaintiffs' motion requests an order to show cause, 'to the intendments set forth in the prayer of their complaint for equitable relief.' Although the motion was filed before the amended complaint and, thus, could only be referring to the original complaint filed on March 9, 1984, the court has deemed plaintiffs' motion to request an order to show cause in accordance with that prayed for in the amended complaint."

## FINDINGS OF FACT

Before the court is the uncontradicted affidavit of Richard Wiener, Chair of the State Party. Mr. Wiener was present in the courtroom on March 16, 1984, the date plaintiffs' motion for an order to show cause why the Michigan Democratic Caucus of March 17, 1984, should not be enjoined, was heard. The affidavit states in pertinent part:

"4. The lengthy process which led to the adoption of the March 17, 1984 caucus rules and procedures by the Michigan Democratic Party began almost four years ago at the 1980 National Democratic Convention. The Convention authorized the cre-

ation of the Commission on Presidential Nomination to undertake 'a complete review of the Presidential Nomination Process for the purpose of making specific recommendations to the Democratic National Committee.'

"5. On July 2, 1981, Democratic National Chair Charles Manatt appointed the members of the Commission. Its 70 members were chosen to represent all regional and constituency groupings within the party. The Commission was chaired by Governor James Hunt of North Carolina and came to be properly known as the 'Hunt Commission.'

"6. The Commission held its organizational meeting on August 20–21, 1981, and then held a series of hearings around the country:

"September 24   Midwest Regional Hearing, Des Moines

"October 3   Southern Regional Hearing, Chattanooga

"October 16   Western Regional Hearing, Los Angeles

"November 5   Eastern Regional Hearing, Washington

"November 5   Hearing for National Witnesses, Washington

"7. In the course of these hearings, the Commission heard from more than 140 Democrats representing a broad cross-section of the Party. Witnesses came from 29 states, Puerto Rico, and the District of Columbia. The Commission heard testimony from the Democratic Caucus of the U.S. House of Representatives and the Democratic Conference of the U.S. Senate, from the national organizations of Democratic mayors, state legislators and county officials, and from a large number of state and local officials. Eleven state chairs and vice chairs testified, including the President of the Association of State Democratic Chairs. The Commission also heard from a host of precinct and county chairs, national and local representatives of Democratic Women, Young Democrats, and other Party organizations, and a number of grassroots Party activists. Constituency groups represented at the hearings included educa-

tors, women's organizations, minority groups, organized labor, and several national political organizations.

"8. The Commission made a special effort to listen to and address the concerns of minority and low-income citizens. For example, the Southern Regional Hearing on October 3, 1981 was held in conjunction with hearings of the DNC Commission on Low and Moderate Income Participation. This interchange helped sensitize the Commission to the substantial barriers to effective participation which lower-income Democrats often face.

"9. The Commission thus consulted widely, with technical and academic experts within the Party and with a full range of interested persons and groups across the country. Its deliberations were open, democratic, and well-publicized.

"10. Among its many goals, the Commission sought to preserve the gains made in recent years in broadening participation in the Party, maintain a fair and open nominating process, and reaffirm the Party's commitments to affirmative action and equal division. Goals and targets under these programs apply to every state's entire delegation. The state parties' responsibility to help lower-income delegates find assistance is clearly established by the Commission. The Michigan Democratic Party has fulfilled those responsibilities.

"11. The Commission held a working session at the conclusion of the hearings on November 6–7, and then met to finalize its recommendations and to approve its final report on January 14–15 and February 5–6, 1982.

"12. The Democratic National Committee adopted the delegate selection rules on March 26, 1982. Thus the national rules, including the 20% threshold at issue in this case, have been known and publicized for nearly two years. A true copy of those rules are appended hereto as Attachment B.

"13. The National Democratic Party Delegate Selection Rules imposed many requirements on the Michigan Democratic Party,

to all of which the Party has conformed. Among other things, these requirements forbade discrimination, mandated affirmative action, and demanded extensive publicity for all meetings and Party activities so that all minority group members would be given the fullest opportunity to participate in the delegate selection process:

"Rule 4. An Open Party

"The Democratic National Committee reaffirms its commitment to the 1964 resolution, and requires the national and state Parties to incorporate the Six Basic Elements, as up-dated, into their Party rules and to take appropriate steps to secure their implementation.

"The 1964 Democratic National Convention adopted a resolution which conditioned the seating of delegations at future conventions on the assurance that discrimination in any state Party affairs on the ground of race, color, creed or national origin did not occur. The 1968 Convention adopted the 1964 Convention resolution for inclusion in the Call to the 1972 Convention. In 1966, the Special Equal Rights Committee, which had been created in 1964, adopted six anti-discrimination standards—designated as the Six Basic Elements, which as up-dated, are as follows:

"(1) All public meetings at all levels of the Democratic Party in each state should be open to all members of the Democratic Party regardless of race, sex, age, color, creed, national origin, religion, ethnic identity, economic status, or philosophical persuasion.

"(2) No test for membership in, nor any oaths of loyalty to, the Democratic Party in any state should be required or used which has the effect of requiring prospective or current members of the Democratic Party to acquiesce in, condone or support discrimination on the grounds of race, sex, age, color, creed, national origin, religion, ethnic identity or economic status.

"(3) The time and place for all public meetings of the Democratic Party on all levels should be publicized fully and in such manner as to assure timely notice to all interested persons. Such meetings must be held in places accessible to all Party members and large enough to accommodate all interested persons.

"(4) The Democratic Party, on all levels, should support the broadest possible registration without discrimination on grounds of race, sex, age, color, creed, national origin, religion, ethnic identity or economic status.

"(5) The Democratic Party in each state should publicize fully and in such a manner as to assure notice to all interested parties a full description of the legal and practical procedures for selection of Democratic Party officers and representatives on all levels. Publication of these procedures should be done in such fashion that all prospective and current members of each state Democratic Party will be fully and adequately informed of the pertinent procedures in time to participate in each selection procedure at all levels of the Democratic Party organization.

"(6) The Democratic Party in each state should publicize fully and in such a manner as to assure notice to all interested parties a complete description of the legal and practical qualifications of all positions as officers and representatives of the state Democratic Party. Such publication should be done in timely fashion so that all prospective candidates or applicants for any elected or appointed position within each state Democratic Party will have full and adequate opportunity to compete for office.

"These provisions demonstrate the intention of the Democratic Party to ensure a full opportunity for all minority group members to participate in the delegate selection process.

"Rule 5, Non-Discrimination

"A. In order that the Democratic Party at all levels be an open Party which includes rather than excludes people from participation, a program of effective affirmative action is hereby adopted.

"B. Discrimination on the basis of sex, race, age, religion, economic status, sexual orientation, ethnic identity, national origin, or color in the conduct of Democratic Party affairs is prohibited.

"C. With respect to groups such as ethnics, youth, persons over 65 years of age, workers, persons with a high school education or less, the physically handicapped, persons of low and moderate income, and other groups significantly underrepresented in our Party affairs, each state Party shall develop and submit Party outreach programs for such groups identified in their plans, including recruitment, education and training, in order to achieve full participation by such groups in the delegate selection process and at all levels of Party affairs.

"Rule 6. Affirmative Action.

"A. In order to encourage full participation by all Democrats in the delegate selection process and in all Party affairs, the national and state Democratic Parties shall adopt and implement affirmative action programs with specific goals and timetables for Blacks, Hispanics, Native Americans, Asian/Pacific Americans and women.

"14. The National Democratic Rules further required the Michigan Democratic Party to adhere to the 20% threshold complained of in this action:

"Rule 12. Fair Reflection of Presidential Preferences.

"A. Delegates shall be allocated in a fashion that fairly reflects the expressed presidential preference or uncommitted status of the primary voters or, if there is no binding primary, the convention and caucus participants. States shall choose one of the following plans for allocating delegates to presidential candidates at the district level:

"(1) Proportional representation. District level delegates shall be allocated in proportion to the percentage of the primary or caucus vote won in that district by each preference, except that preferences falling below the applicable threshold shall not be awarded any delegates.

"The threshold in states holding a binding primary shall be calculated by dividing the number of delegates to be elected in the district into 100%, except that the threshold shall not exceed 25%. The threshold in caucus states shall be 20%.

"(2) Bonus delegate plan. One delegate position per district shall initially be awarded to the primary or caucus/convention winner in that district. The remainder of the delegate positions in that district shall be allocated in proportion to the percentage of the primary or caucus vote won in that district by each preference, except that preferences falling below the applicable threshold shall not be awarded any delegates.

"The threshold in states holding a binding primary shall be calculated by subtracting the bonus delegate from the number of delegates to be elected in the district and dividing this number into 100%, except that the threshold shall not exceed 30%. The threshold in caucus states shall be 20%.

"This option shall not be available to districts in which less than three delegates are elected.

"(3) Direct-election primaries. Individual candidates for delegate and alternate may be voted for directly on a primary ballot, provided:

"(a) That such delegates and alternates shall be elected from districts no larger than a congressional district; and

"(b) That each delegate candidate is identified on the ballot according to his or her presidential or uncommitted preference.

"B. At-large and pledged party and elected official delegate positions shall be allocated to presidential preferences by reference to primary or convention votes or to the division of preference among district-level delegates, as specified in Rule 9C, except that preference falling below a threshold of 20% shall not be awarded any delegates at this level.

"C. In all situations where no preference reaches the applicable threshold, the threshold shall be the percentage of the

vote received at that level by the frontrunner minus 10 percent.

"D. Under no circumstances shall the use of single-delegate districts be permitted.

"E. For the purpose of fairly reflecting the division of preferences, the non-binding advisory presidential preference portion of primaries shall not be considered a step in the delegate selection process.

"15. The adoption of the National Democratic Party's Delegate Selection Rules established a framework for drafting the Michigan delegate selection plan. The National Democratic Party required that Michigan's delegate selection plan be submitted to it for approval on or before April 30, 1983. All other states were also required to submit their plans for approval during April, 1983.

"16. After the November, 1982 elections and just before I took office as Party Chair in early 1983, the Michigan Democratic Party began the process of designing its delegate selection plan in accordance with the national rules.

"17. In early 1983, a 1983–84 calendar for the proceedings of the State Central Committee was established. It included the following dates relevant to the delegate selection plan:

"April 30, 1983  adopt plan as required by Democratic National Committee

"June 18, 1983  adopt 1984 presidential guidelines

"October 8, 1983  hold 1984 delegate selection seminar

"December 10, 1983  adopt final presidential caucus location list

"18. At a meeting of 19 Party Officers, a group representative of the many constituencies in the Party, held on January 17, 1983, and attended by, *inter alia*, Plaintiff Clyde Cleveland, it was discussed and decided that two Party committees would work on the Michigan plan. The first was composed of the 11 Michigan members of the Democratic National Committee. The second was the Rules and Political Reform Committee, composed of 36 people representing all 18 Michigan congressional districts. The membership of the Rules and Political Reform Committee was representative of women, minorities, labor, educators, and other constituencies of the Michigan Democratic Party. Party Officers also agreed to continue their discussions about the design of a plan at their monthly meetings.

"19. Each of these three groups was instructed to consult with the constituencies they represented and others within the Party so that all members would be given input into the drafting of a plan. This they did.

"20. The Democratic National Committee members met and discussed drafting a plan in early February.

"21. Party officers discussed the design of a plan at their February and April 11 and 25 meetings. Plaintiff Clyde Cleveland attended the February 14 meeting.

"22. The Rules and Political Reform Committee met to discuss and work on a plan on February 22, March 16, and March 22, 1983. At the March 22, 1983 meeting the plan was given final approval for publication for public comment. The Party Officers subsequently also approved the plan.

"23. Additional meetings involving other groups in the Party were also held to work on the plan. For instance, a drafting committee met on March 14, 1983 and on March 21, a group of party leaders met to review it.

"24. On April 30, 1983, after much discussion and consideration of amendments, the State Central Committee of the Party, a body of 262 people representing all areas of Michigan all groups within the Party, approved the plan.

"25. Work began during the summer of 1983 on the detailed planning necessary to hold caucuses throughout the state. The County Democratic Parties were designated as primarily responsible for finding and operating the caucus sites in each community. The County Parties were required to recommend caucus sites by September 30, 1983, and to permit 30 days for public input

thereafter. After public input, the Rules and Political Reform Committee was responsible for final caucus sites to the State Central Committee. The State Central Committee was required to adopt a final caucus site list in December, 1983.

"26. For the balance of 1983, and up until today, Party members have worked hard to locate, secure, and publicize the caucus sites. A total of 337 sites throughout the state have been selected. Thousands of workers have been recruited to keep the sites open and run the caucuses from 10:00 a.m. until 4:00 p.m. on March 17, and to tabulate the results afterwards. Many other workers have been involved in the preparation of materials for the caucuses and the training of caucus workers at various seminars held for the purpose by the Party.

"27. On December 14, 1983, the Democratic National Committee declared the Michigan Democratic Plan to be in full compliance with the National Democratic Party's delegate selection rules, including the participation and minority access requirements.

"28. The Michigan Democratic Party has undertaken to publicize the caucuses in a variety of ways. First, the Party has notified members of the Party, precinct delegates, and others on its mailing lists of the date, time, and places for the caucuses. In addition, articles have appeared in the Party's state newspaper, the *Michigan Democrat*, in local party papers, and in regular newspapers publicizing the caucuses. For example, the January, 1984 *Michigan Democrat* contained a final caucus call, describing the caucus process and listing the sites. The Party has further created radio and television tapes to be run by radio and television stations to publicize the caucuses. Also, the Party has held public informational meetings about the caucuses. Finally, the Party, through its rules and procedures, has imposed upon the presidential candidates an affirmative obligation to further publicize the caucuses.

"29. The caucus rules and procedures of the Michigan Democratic Party were developed and finally established through a process within the Party lasting about one year and changes in those rules at this late date would destroy the orderly conduct of the caucuses to be held on March 17, 1984. Among other things, it would be impossible for the Michigan Democratic Party to notify all Democratic voters that the rules of the caucuses had been changed because neither the Party, nor, indeed any other person or organization, is able to compile a list of all the state's Democratic voters. Inevitably, many voters and many sites would operate under the existing rules no matter what changes were ordered. It would be chaos to attempt to change the rules after so much time and effort has gone into developing and implementing them.

"30. Should the March 17, 1984 caucuses be cancelled so that changes can be made in the rules, Michigan would be denied the opportunity to send delegates to the National Convention. The National Democratic Party requires that all delegates be selected by June 12. The Party has been working for over a year to be ready on March 17 and could not possibly change the rules and reschedule the caucuses before early June. Such a cancellation would create a tremendous hardship on the Party, be a waste of resources, entail great expense, cause massive inconvenience, and deprive Michigan Democrats of representation at the National Convention."

■ The court takes judicial notice of the fact that Michigan newspapers have heavily publicized caucus sites and information as to how any interested person may find their site.

The court finds that notice to Michigan Democrats of any cancellation of the Caucus would be impossible, on the afternoon before the day of the long-scheduled Caucus. Moreover, if the Caucus was cancelled, the Democrats of the State of Michigan would be unrepresented at the 1984 Democratic National Convention, because another statewide Caucus cannot be staged prior to the deadline for certification of delegates.

The court will assume *arguendo* that the black population figures presented by plaintiffs' counsel, or the still different figures presented by one of plaintiffs' witnesses, are all true, and that those figures represent blacks who are in fact eligible to participate in the Caucus.

The court will also assume that labor unions in the state of Michigan are interested in the outcome of the caucus, as alleged. However, the court cannot find on the basis of the conclusory allegations made here that any intimidation or coercion has been or will be exercised by any union or its members against persons who might wish to participate in the Caucus and express a preference for plaintiff Jackson as the Democratic Party's presidential nominee.

## CONCLUSIONS OF LAW

■ Although plaintiffs' repeated request is for an "order to show cause," defendants treat plaintiffs' request for relief as a motion for preliminary injunction and do not object to its form. The court has also treated plaintiffs' motion as one for a preliminary injunction enjoining the Caucus until such time as defendants are able to cure the constitutional infirmities alleged by plaintiffs to the satisfaction of plaintiffs. That is the essence of the relief requested. Plaintiffs' counsel, in argument on March 16th, denied that he is requesting an injunction. Rather, counsel asserts that he only wants defendants to comply with the constitution, and only requests an injunction staying the Caucus if defendants are unable to cure the alleged constitutional infirmities before March 17, 1984, the date the Caucus is scheduled to take place. It is undisputed, however, that the various changes requested by the plaintiffs by the complaint filed March 9, and by

motion heard March 16th, could not be accomplished by March 17th. Thus, plaintiffs' motion and prayer for relief of the amended complaint are properly considered as requesting preliminary injunctive relief.

Before the court may issue a preliminary injunction, it must consider four factors:
1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;
2) Whether the plaintiffs have shown irreparable injury;
3) Whether the issuance of a preliminary injunction would cause substantial harm to others;
4) Whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir.1977). *See, American Motors Sales Corp. v. Runke*, 708 F.2d 202, 205 (6th Cir.1983). Failure of plaintiffs to satisfy all of the above factors requires this court to deny the relief requested. Plaintiffs here have failed to satisfy any of the requisite factors.

## I. LIKELIHOOD OF SUCCESS ON THE MERITS

### a. 42 U.S.C. § 1983[5] Claim

To state a claim for which relief can be granted under 42 U.S.C. § 1983, plaintiffs must allege: 1) that they have been deprived of a federal right, and 2) that the person who deprived them of that right acted under color of state or territorial law. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980), citing *Monroe v. Pape*, 365 U.S. 167, 171, 81 S.Ct. 473, 475, 5 L.Ed.2d 492 (1961).

■ Here, plaintiffs do not allege that the actions complained of by the National Party were done under color of any law,

---

**5.** 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immuni-

ties secured by the Constitution and laws, shall be liable to the party injured in a action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

state, territorial or otherwise. As a result, plaintiffs' 42 U.S.C. § 1983 claim against the National Party is subject to dismissal for failure to state a claim for which relief can be granted. *See,* F.R.Civ.P. 12(b)(6). Plaintiffs have failed to show, therefore, that they have a substantial likelihood or probability of success on the merits, as against the National Party.

█ As to the State Party, plaintiffs do allege that the actions complained of were state actions taken under color of law (Compl. ¶ 17). However, the only allegation of authorization in law of the amended complaint appears at paragraph 11 which provides:

> 11. THAT, under the provisions of Article II, Section 1, of the United States Constitution, the President of the United States is to be elected by the vote of Electors, who are themselves to be "appointed" by each State, in such fashion as the Legislatures thereof may direct. That, under the provisions of Section 168.42 MCLA, the selection of those Presidential Electors, in Michigan, has been given over to "each political party of the State." That, under the holding of *Ferency v. Austin,* 666 F.2d 1023, 1981, *6 cir.* [1981], the function of selecting delegates to the Democratic National Convention, at which the Electors required by Article II, Section 1, of the United States Constitution will be chosen, rests entirely with the defendant Michigan State Democratic Party, under the rules which they have adopted, and which are herein made the subject of controversy.

On the record that is before this court, however, it must be concluded that plaintiffs have no likelihood or probability of prevailing in their contention that the actions of the State Party were indeed taken under color of law.

In *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966), the Court stated:

> In cases under § 1983, "under color" of law has consistently been treated as the

same thing as the "state action" required under the Fourteenth Amendment.

The United States Supreme Court and the Court of Appeals for the Sixth Circuit have expressly reserved ruling on whether the decision of a national political party in the area of delegate selection constitutes state or governmental action. *Cousins v. Wigoda,* 419 U.S. 477, 483 n. 4, 95 S.Ct. 541, 545 n. 4, 42 L.Ed.2d 595 (1975); *Ferency v. Austin,* 666 F.2d 1023, 1028 (6th Cir.1981). Recent decisions of the Supreme Court in other contexts, however, indicate that the actions complained of defendants here do not constitute state action.

In *Rendell-Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982), the court held that "state action" cannot be found unless the alleged infringement of federal rights is fairly attributable to the state. That case involved the discharge of certain employees from a private school whose income was derived primarily from public sources and which was regulated by public authorities.

In *Lugar v. Edmonson Oil Co., Inc.,* 457 U.S. 922, 939, 102 S.Ct. 2744, 2755, 73 L.Ed.2d 482 (1982), a case involving a § 1983 suit brought by a debtor against his creditor alleging that in attaching his property pursuant to Virginia's pre-judgment attachment statute, the creditor has acted jointly with the state to deprive him of his property without due process of law, the court articulated a two-pronged test for "state action:" 1) "whether the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority;" and 2) whether defendants may be appropriately characterized as "state actors." Here, plaintiffs have failed to show that they have even a remote probability of satisfying either prong of the *Lugar* test.

In the instant case, the only state authority cited by plaintiffs, on which the complained of actions of defendants allegedly are based, is M.C.L.A. § 168.42 (Compl. ¶ 11). M.C.L.A. § 168.42 provides:

> Sec. 42. In the year in which presidential electors are to be elected as provided

in section 43 of this act,[1] each political party in this state shall choose at its fall state convention as many electors of president and vice-president of the United States as this state may be entitled to elect of senators and representatives in congress, and the chairman and the secretary of the state central committee of each political party shall, within 24 hours after the conclusion of the state convention, forward by registered or certified mail a certificate containing the names of such electors so chosen to the secretary of state. Those candidates for electors of president and vice-president of this state shall be deemed elected whose names have been certified to the secretary of state by that political party receiving the greatest number of votes for said office at the ensuing November election. P.A.1954, No. 116, § 42, Eff. June 1, 1955, as amended P.A.1955, No. 271, § 1, Imd.Eff. June 30; P.A.1956, No. 190, § 1, Imd.Eff. April 26.

[1] Section 168.43.

Plaintiffs' reliance upon M.C.L.A. § 168.-42 is misplaced. That statute clearly relates to the selection of electors for president and vice-president of the United States by the political parties of the State of Michigan at the fall state conventions preceding a November presidential election. The rules of the State Party challenged here, however, relate to the selection of delegates by March caucuses for the July Democratic National Convention. These delegates do not select the electors referred to in M.C.L.A. § 168.42; rather they select the Democratic Party's presidential nominee at the national convention. Con-

trary to plaintiffs' allegations, the selection of electors does not take place at the Democratic National Convention, but at the subsequent State Party Convention.

■ In addition to the facial inapplicability of M.C.L.A. § 168.42 to the conduct complained of here, the Supreme Court has rejected plaintiffs' theory of reliance upon Article II, Section 1, of the United States Constitution[6] which confers upon the states the power and responsibility to appoint electors. In *Democratic Party of the United States v. Wisconsin*, 450 U.S. 107, 125 n. 31, 101 S.Ct. 1010, 1021 n. 31, 67 L.Ed.2d 82 (1981), the court stated that:

> Any connection between the process of selecting electors and the means by which political party members in a State associate to elect delegates to party nominating conventions is so remote and tenuous as to be wholly without constitutional significance.

■ Plaintiffs also fail to satisfy the second prong of the *Lugar* test. Defendants may not be appropriately characterized as "state actors." As is apparent from the preceding findings of fact, the actions of defendants in formulating and implementing the challenged rules were through members of the Democratic Party, not by officials of the State of Michigan. There is undisputedly no authorization for these caucuses in State law, and no state governmental assistance or participation in the event whatsoever.

*b. 42 U.S.C. § 1985(3)[7] Claim*

■ To prevail on their 42 U.S.C. § 1985(3) claim, plaintiffs must, *inter alia*,

6. U.S. Const. art. II, § 1 provides in pertinent part:

Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress; but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

7. 42 U.S.C. § 1985(3) provides:

(3) If two or more persons in any State or Territory conspire or go in disguise on the

highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State of Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a

establish "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Carpenters v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 3358, 77 L.Ed.2d 1049 (1983), quoting *Griffin v. Breckenridge,* 403 U.S. 88 at 102, 91 S.Ct. 1790 at 1798, 29 L.Ed.2d 338 (1971).

Here, not only have plaintiffs failed to allege or state facts constituting any "conspiracy" between defendants, they have also failed to show any invidiously discriminatory animus underlying defendants' actions. Even if plaintiffs had shown that the challenged rules had an adverse impact on plaintiffs, and there has been no such showing, that, alone, would be insufficient to show an invidiously discriminatory animus. Indeed, on the record that is before this court, it appears that the challenged rules were promulgated, at least in part, to ensure and increase the participation of blacks, the elderly, and other disadvantaged groups in the process of selecting the Democratic Party's presidential nominee.

## 2. IRREPARABLE INJURY

Plaintiffs have failed to demonstrate that, absent the requested injunctive relief, they will suffer irreparable injury. Indeed, plaintiffs have failed to show they will suffer any injury at all.

■ This court is not permitted to speculate in an effort to find irreparable injury. *See, Carter v. City of Fort Worth,* 456 F.2d 572, 576 (5th Cir.1972), *cert. denied,* 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972); 11 Wright A. Miller, *Federal Practice and Procedure* § 2942, p. 369 and n. 51; § 2948, pp. 436–47. Underlying many, but not all, of plaintiffs' allegations is the presumption that because plaintiff Jackson is a black man, only black voters, and all black voters, will vote for him; and, conversely, that only white voters, and all white voters, will vote for the other non-black Democratic presidential candidates. There has been no showing that this presumption is, in fact, justified.

Furthermore, plaintiffs have failed to demonstrate a nexus between the challenged actions of defendants and plaintiffs' conclusory and speculative allegations of injury. There is no basis for the conclusion that plaintiff Jackson would be more adversely affected by the 20% district threshold requirement than by the absence of thresholds or a statewide threshold, or that any reasonable alternative exists. There is no basis for a finding that persons wishing to vote for plaintiff Jackson would be discouraged from doing so because of fear of unlawful retaliation from those unions which have endorsed candidate Walter Mondale for the Democratic Party's presidential nomination. There is no basis for a finding that the number of ballots printed is insufficient and would disproportionately deprive plaintiff Jackson of delegates which he would have won had more ballots been prepared. There is no basis for a finding that ballots have been open to seizure by party members, or that plaintiff Jackson would be unevenly injured by such seizure. There is no basis for a finding that those Democrats who are unable to vote at any of the designated polling places because they are in prison, handicapped, ill or elderly, would otherwise have expressed a preference for Jackson. There is no basis for concluding that the hours of voting and the form required to be completed would combine to deprive plaintiff Jackson of delegates. Moreover, plaintiffs have failed to even suggest that any of the actions of defendants complained of in this

legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

suit do not fall equally upon all candidates and their supporters.

### 3.  SUBSTANTIAL HARM TO OTHERS

 If this court were to attempt to grant the unclear injunctive relief requested by plaintiffs, the Michigan Democratic Party Caucus scheduled to take place Saturday, March 17, 1984, could not occur. It appears to the court, on the basis of the uncontradicted affidavit of Richard Wiener, Chair of the Michigan Democratic Party, that if the court were to grant the requested injunctive relief, thereby cancelling the Caucus on its eve so that the Michigan Democratic Party's rules could be changed, Michigan Democrats would be denied altogether the opportunity to send any delegates to the National Convention. It appears that the National Democratic Party requires all delegates to be selected by June 12 and that the Michigan Democratic Party would be unable to change its rules and reschedule the Caucus before early June. Certainly this result would cause substantial harm to the hundreds of thousand of Michigan Democratic residents who intended to express their preferences.

Plaintiffs could have filed this suit as early as March 26, 1982, the date that the Democratic National Committee adopted the delegate selection rules, which included the 20% threshold at issue here, or certainly by December 14, 1983, the date the Democratic National Committee declared the Michigan Democratic Party to be in compliance with the National Democratic Party's delegate selection rules. Instead, plaintiffs waited until March 9, 1983, in the afternoon, eight days before the March 17th caucuses, to file suit.

### 4.  PUBLIC INTEREST

Even if this court were able to find some state action here, the public interest could not be served by the issuance of the requested injunctive order. Indeed, as previously recited, it appears to the court that the public would suffer irreparable damage if such an injunction were to issue.

### CONCLUSION

There being no state action whatsoever of which to complain, the complaint must be and is dismissed.